**Edward Dennis JACKS, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 777S525.

Supreme Court of Indiana.

Sept. 26, 1979.

Rehearing Denied Nov. 15, 1979.

Nile Stanton, Philip R. Melangton, Jr., Indianapolis, for appellant.

Theodore L. Sendak, Atty. Gen., Dennis K. McKinney, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-appellant, Edward Dennis Jacks, Jr., was found guilty of first degree murder by a jury in Elkhart Superior Court on November 11, 1976. He was sentenced to life imprisonment. His motion to correct errors was overruled by the trial court and he brings this appeal. Appellant raises seven issues for our consideration, regarding:

(1) whether the trial court erred in admitting into evidence a tape recording of a telephone conversation between appellant and his mother; (2) whether the trial court erred in admitting into evidence a statement made by Jacks while in custody that he wished to consult with an attorney; (3) whether the trial court erred in refusing defendant's tendered verdict form pertaining to the insanity defense; (4) the sufficiency of the evidence with regard to defendant's sanity at the time of the offense charged; (5) rulings of the trial court concerning testimony during cross-examination of two expert witnesses; (6) whether the trial court erred in giving certain instructions; and (7) whether the closing argument by the prosecuting attorney was improper.

Edward Dennis Jacks, Jr., was a gun dealer who operated his business from his home in Elkhart, Indiana, where he resided with his wife and their two children. In August of 1975, he went to Marietta, Georgia, with his brother, an attorney from Illinois, to negotiate a transaction for the sale of a large number of guns to a foreign country. Jacks expected the sale to net him about $150,000. However, the deal fell through, and on August 27, 1975, appellant Jacks returned north and spent the night at his parents' home in Park Forest, Illinois. Appellant was depressed and upset because the deal had fallen through in Georgia. Early in the morning of August 28, 1975, he returned to his home in Elkhart. He called

his wife at her place of employment and was advised by her that she had filed for divorce. She also told him she had obtained an apartment for herself and her children since he would need the home for his business, and that she had obtained a restraining order to prevent him from interfering with her custody of the children. He called his parents in Illinois and related this to them, although the evidence conflicted as to whether he called them more than once.

Witness Pat Munson was the director of the nursery school that appellant's children attended. Munson testified that appellant's wife, Kathleen Jacks, came to the school in the afternoon of August 28, and asked Munson to accompany her to the Jacks home to pick up some clothes and belongings. Mrs. Jacks was fearful of going to the home alone because appellant was upset with her about the divorce. Munson agreed that she would follow Kathleen Jacks in her automobile. When they arrived at the Jacks residence, Munson pulled up behind the Jacks automobile near the garage. Kathleen Jacks got out of her car and started toward the front door with her two children at her side. Pat Munson got out of her car and started toward the door, some twenty feet behind Mrs. Jacks. At this point, the front door opened and appellant stepped out of the house holding a rifle. Mrs. Jacks turned and started to run. Munson testified that appellant then began shooting at his wife. Munson said that the weapon was a rapid fire rifle, and that many shots were fired. Mrs. Jacks was struck by two bullets, and was pronounced dead at the Elkhart Hospital a short time later.

There was evidence that appellant Jacks had called acquaintances prior to this incident and told them he was going to kill his wife. Police officers who came to the scene testified that Jacks made statements to them of: "the damned gun jammed," and "she's been shot, get her out of here and take her to the hospital—you guys don't know what you're doing," and "Do you want to get shot, too?" to an ambulance attendant. Jacks' defense was that he was insane at the time this act was committed.

I.

Helen Jacks, mother of appellant, was called by the defense as a witness and told the jury, generally, about the activities of August 27, when appellant stayed at her home, and about her conversations with him on the telephone after he returned home on August 28. There was some conflict as to whether she had talked to him more than once on the telephone on the 28th. On cross-examination, the prosecuting attorney asked Helen Jacks if it was not a fact that her son Edward Dennis told her on the telephone that he was going to kill his wife. She denied that such conversation took place. The prosecutor then asked her if she had had a telephone conversation with appellant on the evening of August 28, after he had been arrested. She stated that she did have such a conversation. She was then asked about statements made by appellant and her responses to those statements during the conversation. She stated that she did not recall some of the conversation and denied that other statements had been made. It became evident that the police had taped this telephone conversation and that the prosecution had the tape and a transcript of it in court with them.

The defendant also took the stand in his own defense. On cross-examination, he was asked about this conversation with his mother. He stated that he thought he had talked to her, but did not remember anything about the conversation. He testified that he was unable to remember any of the particular statements made by either of them on the phone.

Appellant testified that he had no memory of any of the events after he saw his wife drive into the driveway. He stated that he had a vague memory of seeing her lying on the sidewalk, but didn't remember how she got there. His memory of events at the police station was hazy, and he said he could not recall any of them.

After the defense rested, the State offered the tape recording into evidence to rebut the credibility of appellant's mother,

Helen Jacks, regarding her testimony concerning the telephone conversation. The tape recording was also offered to rebut appellant's credibility regarding his statements about his mental condition at the time. The court permitted the tape to be played to the jury after admonishing and instructing them that it could be considered only for the purpose of impeaching Helen Jacks' and appellant's credibility, and was not to be considered as evidence of the commission of the act.

The conversation was as follows:

"Helen Jacks: Hello?

Edward Jacks: Hello.

Helen Jacks: Hello?

Edward Jacks: Mom?

Helen Jacks: Denny?

Edward Jacks: Hello.

Helen Jacks: Yes?

Edward Jacks: Where's Dad?

Helen Jacks: He's next door at your neighbor's.

Edward Jacks: Well, I'm in jail.

Helen Jacks: I know it. Well, how do you feel about that? That's what you wanted, wasn't it?

Edward Jacks: Hello?

Helen Jacks: Yes?

Edward Jacks: Well, is he going to come down and talk to me or what?

Helen Jacks: They won't let him talk to you.

Edward Jacks: They won't let him talk to me?

Helen Jacks: No, but he's at—what is your neighbor's name? I can call him down there.

Edward Jacks: Best.

Helen Jacks: I don't know. Do you know their phone number?

Edward Jacks: The first name is John. The last name is Best.

Helen Jacks: B–E–S–T?

Edward Jacks: B–E–S–T.

Helen Jacks: John?

Edward Jacks: Yea.

Helen Jacks: Well, how come they let you call? Can't you call there?

Edward Jacks: Well, let me ask the men here if I can to that and we'll see. Is he down there now?

Helen Jacks: Yes. He's next door. I just talked to him.

Edward Jacks: Okay. Well, I'll try it that way.

Helen Jacks: Well, wait a minute now, he's trying to get hold of a lawyer so if the phone's busy, that's why. Denny, I still can't believe it.

Edward Jacks: What do you want me to have? Am I supposed to do something, or what?

Helen Jacks: I think you already did it.

Edward Jacks: Yea.

Helen Jacks: She sure never deserved that.

Edward Jacks: Huh?

Helen Jacks: She sure never deserved anything like that.

Edward Jacks: Push hard enough and it will break.

Helen Jacks: Huh?

Edward Jacks: Push hard enough and it will break.

Helen Jacks: Well, I begged you not to do it.

Edward Jacks: Well, we got a smart-ass brother saying he wanted an audience and all this kind of shit, that's what did it.

Helen Jacks: Oh, come on now.

Edward Jacks: Sorry."

Record at 848–50. The defendant claims the taped conversation should have been excluded from evidence under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1970). § 2515 of the Act provides:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial  .  .  . if the disclosure of that information would be in violation of this chapter."

The trial court allowed the recording to be played to the jury, relying on *United States v. Caron*, (5th Cir. 1973) 474 F.2d 506.

In *Caron*, the defendant had denied he was a gambler and that he ever gambled. The trial court admitted into evidence, for the limited purpose of rebutting defendant's testimony, an admittedly illegally wiretapped telephone conversation between the defendant and a bookmaker, in which bets and wagers were being placed. The Fifth Circuit Court of Appeals affirmed, citing *Harris v. New York*, (1971) 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1, and *Walder v. United States*, (1954) 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503. In *Walder*, the Supreme Court pointed out:

"It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* [*v. United States*, (1914) 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652,] doctrine would be a perversion of the Fourth Amendment."

*Id.* at 65, 74 S.Ct. at 356, 98 L.Ed. at 507. The court in *Caron, supra*, then noted that there is no justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the government's disability to challenge his credibility. 474 F.2d at 509.

■ *Caron, supra*, went on to hold that the result was not affected by the language of 18 U.S.C. § 2515. The court found that the legislative history of the Act clearly indicates that this section was not intended to exclude evidence under the present circumstances:

"There is, however, no intention to change the attenuation rule. [citations omitted.] Nor generally to press the scope of the suppression [rule] beyond present search and seizure law. *See Walder v. United States*, (1954) 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503."

S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin. News, pp. 2112, 2185. Thus, it is clear, as *Caron* held, that § 2515 was not intended to prevent the use of illegally obtained recordings of telephone conversations for impeachment purposes.

■ The facts and circumstances in this case are very similar to those of *Caron* and *Walder*. Therefore, we hold that the trial court properly admitted this tape recording into evidence with the limiting instructions that were given.

## II.

■ A tape recording of a conversation that appellant Jacks had with a police officer, Miller, at the police station on the night he was arrested was admitted into evidence and played for the jury. This tape revealed a conversation between Miller and Jacks in which Miller advised Jacks of his constitutional rights pursuant to *Miranda v. Arizona*, (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. These were acknowledged by appellant Jacks and the conversation then continued as to the events of the evening. They discussed Jacks' employment and that of his wife, the fact that he was a licensed gun dealer, and the fact that his parents were coming from Illinois to join him there. Jacks also made the following statement to Miller: "I am not some kind of machine gun maniac or something like that, I didn't shoot my wife with a machine gun or anything else. And I would like them to understand that they are not scoring on some kind of a lunatic or something like that." After further discussion, Jacks then said to Officer Miller: "As regards whatever happened this evening, I want to talk to my attorney." Officer Miller agreed, and the conversation then ended.

Appellant objects only to the admissibility of the last portion of the recording, in which he stated that he wanted to talk to his attorney before talking to the police any further. He argues that admitting this statement into evidence before the jury was prejudicial, in that his exercise of his constitutional rights to remain silent and have the assistance of counsel worked to his detriment in the eyes of the jury. He cites this Court's position in *Jones v. State*,

(1976) 265 Ind. 447, 355 N.E.2d 402, which condemned the penalization of the accused's pre-trial silence, under *Doyle v. Ohio*, (1976) 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91. In *Doyle*, the Supreme Court held that it was violative of the due process clause of the Fourteenth Amendment for the prosecution to use an accused's post-arrest silence for impeachment purposes.

The admission of this recording into evidence did not violate the mandate of *Doyle v. Ohio* and *Jones v. State*. Those cases involved a situation where an accused's failure to deny or refusal to respond to accusations by police were used by the prosecution to impeach the defendant's trial testimony. *Doyle* and *Jones* noted that revealing the defendant's refusal or failure to respond or his request for an attorney before he responds to accusations would prejudicially penalize him for exercising his right to remain silent and have counsel present. The admission of the conversation in this case did not place appellant in that position. This statement was merely one of the many statements and responses made in the course of a rather lengthy discussion. During this discussion, appellant made certain statements concerning the events of the evening that amounted to admissions and denials. The conversation as a whole was clearly admissible, and appellant does not dispute this fact. This statement was included in the recording to show the conclusion of the conversation. If it had been deleted, it is entirely possible that the jury would have been confused or misled by an abrupt halt in the conversation. Appellant was not prejudiced by the court's failure to delete this statement. We find no error as to this issue.

### III.

■ Appellant alleges error in the trial court's refusal to submit his tendered verdict form to the jury. At the close of all of the evidence the defendant tendered a verdict form which read as follows: "We the jury find the defendant not guilty by reason of insanity, the State having failed to prove beyond a reasonable doubt that the defendant was sane on August 28, 1975." The court refused this tendered form, but did give instructions on the insanity defense and did submit a verdict form that authorized the jury to find the defendant not guilty by reason of insanity. Among its final instructions was one in which the trial court instructed the jury that if at the time of the crime defendant was insane then the jury must find him not guilty. The jury was therefore properly instructed and was furnished sufficient and proper verdict forms. *Pollard v. State*, (1979) Ind., 388 N.E.2d 496, 506; *Murphy v. State*, (1977) Ind., 369 N.E.2d 411, 417.

### IV.

■ Appellant's next argument is that the State failed to prove beyond a reasonable doubt that he was legally sane at the time of the commission of the offense. This invites us to substitute our judgment for that of the jury's in weighing the evidence and judging the credibility of witnesses. It would be improper for us to do this, and we have consistently refused to do so. *Taggart v. State*, (1979) Ind., 390 N.E.2d 657, 659; *Sypniewski v. State*, (1977) Ind., 368 N.E.2d 1359, 1363–64.

Conflicting expert and lay testimony was presented on this subject. The expert witnesses who testified on the issue of appellant's sanity were in conflict as to their findings. The State presented expert and lay evidence of defendant's sanity. Dr. George S. Westfall testified that he had examined defendant and determined that he was sane at the time of the murder. Kathryn Brown, an electroencephalogram technologist, testified that she spoke with defendant after the murder, when she was requested to give him a second test. She asked him why he was appearing for his second test, and he told her, "My attorney wanted me to go the insanity route, but I'm just as sane as anyone else."

■ The jury had ample facts before it and inferences to be drawn from those facts from which it could find beyond a reasonable doubt that the defendant was sane at the time of the commission of this act.

There is no reason why we should disturb their verdict. This issue is without merit.

## V.

Appellant alleges the State was allowed to improperly cross-examine two expert witnesses. The defendant called two psychiatrists as expert witnesses. On cross-examination, the prosecutor asked both of these witnesses, among other things, about their understanding and use of the term "mental defect." In their written reports and in their testimony, they had indicated that defendant was suffering from a "mental defect," and both indicated that the circumstances of stress facing the defendant created this mental defect. They stated that the defect was a form of temporary insanity which rendered appellant incapable of conforming his actions to society or to the law.

The prosecutor questioned these witnesses in relation to the standard they understood should be applied, based on the definitions of "mental defect" and "mental disease" provided for in *Hill v. State,* (1969) 252 Ind. 601, 251 N.E.2d 429. Under *Hill,* a mental disease is that which can improve or deteriorate, and a mental defect is a condition which is not considered capable of either improving or deteriorating. A mental defect may be either congenital or the result of injury, or the residual effect of a physical or mental disease. The prosecutor sought to inquire of these witnesses whether their use of the term "mental defect" was used in the context of these definitions, inasmuch as they had testified that appellant's mental defect was temporary because of oppressive circumstances and had improved immediately after the events of August 28, 1975. Both witnesses testified that this would not be their definition of a mental defect. They stated that, to them, a mental defect was a more general or generic term that had to do with temporary and fluctuating defects in the functions of the mental processes.

■ Based on the definitions set out in *Hill, supra,* the trial court permitted the prosecutor to examine these doctors to determine if they had used the *Hill* standards in their examinations and if their use of those terms employed those meanings. This was a proper subject of cross-examination, and the court did not err in allowing this line of questioning.

## VI.

■ The appellant next claims error in the giving of several instructions, which we will consider individually. Court's instruction number thirteen, which dealt with criminal intent, was not objected to by the defendant at the time it was given. He first raised objection to it in his motion to correct errors. Since he did not object at the time the instruction was given, any error is waived and we will not consider it. *Murphy v. State, supra; Bell v. State,* (1977) Ind., 366 N.E.2d 1156, 1160.

■ Appellant next complains of Court's instruction number twenty-two, which reads as follows:

You are instructed that you are not bound by special definitions or conclusions as to what experts state is a mental disease or defect of the mind.

What experts may consider a "mental disease or defect" where there (sic) concern is treatment, may or may not be the same as "mental disease or defect" for the jury's purpose in determining criminal responsibility.

The term "mental disease" generally is used to denote a condition capable of either improving or deteriorating.

The term "mental defect" generally is used to denote a condition which is not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual effect of a physical or mental disease.

You are instructed that a "mental disease" or defect includes any abnormal condition of the mind which substantially impairs behavior controls."

Record at 240. We see no error in this instruction. This was a proper statement of the law under *Hill v. State,* (1969) 252

Ind. 601, 251 N.E.2d 429. The instruction also advised the jury that they were not bound by the conclusions and findings of the expert witnesses but could make their own determination as to the mental condition of the defendant based on the evidence. This is also consistent with *Hill, supra,* wherein we stated: "Extreme care must be taken at this point to guarantee that the psychiatrists do not usurp the function of the jury. The jury should never be bound by the definitions or conclusions of the experts as to what is a disease or defect." Id. at 615, 251 N.E.2d at 437. *See Sypniewski v. State, supra.*

State's tendered instruction number four, which was given by the court, was as follows:

"You are instructed that the criminal law is an expression of the community's conscience or moral sense. It is important, therefore, to remember that when considering a defense to criminal responsibility, the mere proof that a certain mental condition existed at the time of the act, or that there is some causal connection between the mental state of the Defendant and the act itself is not enough. Rather there must be a showing that the Defendant's mind was so affected, he failed to recognize and appreciate his duty to society or (sic) complying with its code of acceptable behavior or that appreciating such fact, he lacked the capacity to conform his conduct to such requirements.

You are further instructed that to be responsible within the meaning of the term 'criminal responsibility' means (1) to be able to recognize and discharge various duties and (2) to be morally censurable for the voluntary breach of those duties and legally liable if their violations is (sic) forbidden by law."

Record at 273. The language of this instruction is taken from *Hill v. State, supra.* The mere fact that certain language or expressions are used in the opinions of this Court to reach its final conclusion does not make it proper language for instructions to a jury. Judicial opinions frequently include general background information and even specific data which are intended for use by legal technicians, but which are unnecessary to a proper set of jury instructions. State's instruction number four is of this nature and was unnecessary. It was, however, a reasonable explanation in view of all the other instructions, including court's instruction number twenty-two, and was to be considered by the jury in conjunction with all other instructions. Under these circumstances it was not error to give instruction number four. *Sceifers v. State,* (1978) Ind., 373 N.E.2d 131, 135; *Brannum v. State,* (1977) Ind., 366 N.E.2d 1180, 1185.

Finally, appellant objects to the court's giving of State's tendered instruction number five, which reads as follows:

"You are instructed that where a specific intent is required to make an act an offense, such as in the charge preferred against the Defendant, a purpose by direct evidence, for purpose and intent are subjective facts. That is, they exist within the mind of man, and since you cannot delve into a person's mind and determine his purpose and intent, you may look to all the surrounding circumstances, including what was said and done in relation thereto; that everyone is presumed to intend the natural and probable consequences of his voluntary acts, unless the circumstances are such to indicate the absence of such intent.

When an unlawful act, however, is proved to be knowingly done, no further proof is needed on the part of the state in the absence of justifying or excusing facts, since the law presumes a criminal intent from an unlawful act knowingly done."

The only objection made to this instruction was as follows:

"Objection to State's Instruction 5 because it's confusing by the presumption of the intention of natural and probable consequences of his acts when there is interposed herein the defense of insanity and there is no presumption of sanity. Therefore, at least the Court should have included the words 'voluntary' and 'sane

act' within the last sentence of the first paragraph."

Record at 909.

It is appellant's position that this instruction virtually "demolished" his insanity defense because it was inconsistent with the other instructions and permitted the jury to presume the defendant was criminally responsible for his acts and therefore did not act because of his insane condition. As we have already stated above, the jury was amply and properly instructed on the issue of insanity. This was a general intent instruction which advised the jury how they were to handle the intent issue.

After this cause had been fully briefed and was pending before this Court, appellant brought to the attention of this Court a recent decision of the United States Supreme Court, *Sandstrom v. Montana*, (1979) —— U.S. ——, 99 S.Ct. 2450, 61 L.Ed.2d 39. In the *Sandstrom* case, the trial court instructed the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." Defense counsel objected, arguing that the instruction had the effect of shifting the burden of proof on the issue of intent ("purpose or knowledge") to the defense, which is impermissible under the due process clause of the Fourteenth Amendment. *Id.* at ——, 99 S.Ct. at 2453. The Supreme Court held in *Sandstrom* that where intent is a material element of the crime charged, this instruction may not be given. *Id.* at ——, 99 S.Ct. at 2459–60. As Sandstrom's attorney had argued, such an instruction may have the effect of shifting the burden of proof on this element to the defense. This shift is impermissible under *In re Winship*, (1970) 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, and its progeny. *See Patterson v. New York*, (1977) 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281; *Mullaney v. Wilbur*, (1975) 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508.

In the case before us, this issue was not raised before the trial court or in the motion to correct errors. Further, however, it would appear the instruction given in this case does not have either the conclusive or burden-shifting effect the Court found repugnant in the *Sandstrom* case. "Sandstrom's jurors were told that 'the law presumes that a person intends the ordinary consequences of his voluntary acts.' They were not told they had a choice, or that they might infer that conclusion; they were told only that the law presumed it. It is clear that a reasonable juror could easily have viewed such an instruction as mandatory." —— U.S. at ——, 99 S.Ct. at 2454. In the present case the trial court did make the statement found in *Sandstrom*. However, the court qualified it by stating that the jurors were to look to all of the surrounding circumstances, including what was said and done in relation to the acts, and that everyone is presumed to intend the natural consequences of his voluntary acts *unless* the circumstances are such as to indicate the absence of such intent. The second paragraph of State's instruction number five says that "[w]hen an unlawful act, however, is proved to be knowingly done, no further proof is needed on the part of the State *in the absence of justifying or excusing facts . . . .*" Record at 274 (emphasis added). Therefore, we do not feel that this instruction was as limited and mandatory in effect as the United States Supreme Court found the instruction in *Sandstrom* to be. We find no error as to this issue.

This is not to say that we are not mindful of the problems with the general type of instruction criticized by the Supreme Court in *Sandstrom* and other cases cited therein. We have approved instructions that jurors are justified in *inferring* intent from the use of a deadly weapon in a manner calculated to cause death or injury. *Dozier v. State*, (1976) 264 Ind. 329, 343 N.E.2d 783; *Pinkerton v. State*, (1977) 258 Ind. 610, 283 N.E.2d 376. Allowing the jury to draw an inference from facts presented to it, however, is different from telling the jury the law presumes a fact. A presumption is considered to be true unless and until proved otherwise; an inference is something drawn from a fact already proved. A proper instruction on the subject, then, would advise the jury that they may *infer*

·intent from certain proved acts of the defendant, and not that the law presumes that intent.

## VII.

■ Appellant claims the prosecutor engaged in improper closing argument. Among other assertions, the prosecutor told the jurors that they were sitting in judgment in this case, they were the ones to make the decision, and they were the moral conscience of the community. He stated that when they read the newspapers about "this horrible thing" that happened, they may say to themselves, "Why don't they do something—why this happens here"— Where are the police, where are the prosecutors, where are the judges?", but in this case they have to ask themselves "Where is the jury?", because the jury is the one making the decision. In discussing the defense of insanity, the prosecutor stated that if they found the defendant not guilty by reason of insanity at the time the act was committed, and he was found to be sane at the present time, he would go free and be walking "the same streets" as the jurors. Record at 922–23. The court overruled appellant's motion for mistrial based on these remarks.

The defendant testified in his own defense in this case. He indicated that he had no memory of the actual occurrence of the event. There were a number of witnesses that refuted this statement, including Kathryn Brown, the electroencephalogram technologist, who stated that the defendant told her he was "going the insanity route" on the advice of his attorney. The State was arguing, in reviewing all these facts, that the defendant was, at the time of his trial, feigning temporary insanity to escape responsibility for his acts. The prosecutor spent a great deal of time in his argument reviewing the testimony and evidence tending to show that the defendant was guilty and urged the jury to find him guilty on these grounds. The prosecutor's statements in this case were not necessary, nor are they commendable. The court should have admonished the jury to disregard them.

However, in view of the facts and circumstances here, and the entire argument given by the prosecutor, which was not typified by these statements, we cannot say that these isolated statements put appellant in such grave peril that it warrants reversal of his conviction. *Rock v. State*, (1979) Ind., 388 N.E.2d 533, 536; *Hackett v. State*, (1977) 266 Ind. 103, 109, 360 N.E.2d 1000, 1003.

The judgment of the trial court is affirmed.

All Justices concur.