Hiram I. COBB, Appellant,

v.

STATE of Indiana, Appellee.

No. 778S142.

Supreme Court of Indiana.

Nov. 7, 1980.

Rehearing Denied Jan. 15, 1981.

Roger D. Reason, Greenfield, for appellant.

Theo. L. Sendak, Atty. Gen., Palmer K. Ward, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant–appellant Hiram I. Cobb was charged in Morgan Superior Court with first degree murder and bank robbery, Ind. Code §§ 35–13–4–1 and 35–13–5–1 (Burns 1975). A change of venue was granted to Hancock Superior Court and Cobb was subsequently found guilty of second degree murder and bank robbery. He was sen-

tenced to a term of life for the second degree murder conviction, and to a term of twenty years on the bank robbery charge.

Twelve issues are presented to us for consideration in this appeal, concerning the following: (1) whether the trial court erred in limiting the defendant to twenty peremptory challenges of prospective jurors; (2) the trial court's refusal to sequester the jury; (3) the trial court's refusal to grant a continuance and discharge the jury due to the defendant's illness; (4) whether the trial court should have suppressed oral statements made by Cobb to police officers; (5) the search of Cobb's truck without a search warrant and the seizure and admission of articles found therein; (6) whether the defendant was properly charged and tried under the state bank robbery statute, rather than under a similar federal statute; (7) whether the prosecutor engaged in prejudicial acts of misconduct; (8) whether there was an improper in–court identification; (9) the sufficiency of the evidence in regard to the issues of insanity and specific intent; (10) the trial court's refusal to give Cobb's tendered instructions; (11) whether the trial court erred in giving two particular instructions; and (12) whether Cobb was sentenced properly.

On December 26, 1975, the Waverly Branch of the First National Bank of Martinsville, in Morgan County, was robbed at gunpoint. Witnesses testified that a sawed–off shotgun was used in the robbery, and later identified appellant Cobb as the perpetrator. The perpetrator took money from two of the teller windows, including some "bait" money placed in the drawer of the teller's cage for purposes of identification, in the event of a robbery. Witnesses stated that the perpetrator escaped in a red and white Ford pick–up truck, the side of which bore the legend "Concrete Work." The truck proceeded south on State Road 37. During subsequent radio communications among police officers who were in pursuit, Deputy Sheriff Dunigan relayed that he was behind the truck being sought. The next voice heard over the radio was an unknown voice making reference to an ambulance. Officer Dunigan was later found by his car, wounded by a shotgun blast from which he later died. Most of the right side of his face had been obliterated. Appellant proceeded past the scene of the shooting of Officer Dunigan, eventually driving into a residential area known as the Foxcliff Addition, where he then abandoned his truck and proceeded on foot. State Trooper Strader and other officers tracked his footprints in the snow to a vacant house in the Foxcliff area. They found Cobb inside, and he surrendered himself on demand. In a bathroom of the vacant house, Officer Strader observed a pair of boots, large sums of money, and a sawed–off shotgun. Officer Strader also removed ammunition and packages of money from Cobb's pockets. The money was identified as that taken in the robbery of the Waverly branch bank.

## I.

Appellant contends that since he was charged with the murder of a police officer acting in line of duty, he was therefore subject to the death penalty and, under Ind.Code § 35–1–30–2 (Burns 1975), should have been given twenty peremptory challenges rather than ten. This crime was committed December 26, 1975. Appellant was charged under Ind.Code § 35–13–4–1 (Burns 1975). On May 6, 1977, this Court held the death penalty provision of that statute unconstitutional. *See French v. State*, (1977) 266 Ind. 276, 362 N.E.2d 834. Therefore, it was not possible for the death penalty to be imposed in this case, and the jury was so instructed. On October 1, 1977, after the jury had been selected, a new capital punishment statute went into effect, and appellant argues that he was once again subject to the death penalty. He is, of course, incorrect in this assertion. We have decided this same issue in several cases, the most recent of which was *Bates v. State*, (1977) 267 Ind. 8, 366 N.E.2d 659. We held in *Bates v. State* that, inasmuch as the defendant was not subject to the death penalty, he was entitled to but ten peremptory challenges. The same is true of appellant Cobb here, and the trial court did not

err in allowing only ten peremptory challenges. *Bates v. State, supra*; *Arthur v. State*, (1976) 264 Ind. 419–420–21, 345 N.E.2d 841, 842; *Riggs v. State*, (1976) 264 Ind. 263, 268, 342 N.E.2d 838, 842; *Martin v. State*, (1974) 262 Ind. 232, 242, 314 N.E.2d 60, 68. *See Fair v. State*, (1977) 266 Ind. 380, 364 N.E.2d 1007; *French v. State, supra*. *See also Norton v. State*, (1980) Ind., 408 N.E.2d 514.

## II.

After the jury was empanelled and before the presentation of evidence, the defendant moved that the jury be sequestered. The court denied the motion at that time. Toward the end of the trial, the issue of Cobb's sanity was to be presented to the jury. At that time, the news media was devoting a great deal of attention to the case of Anthony Kiritsis, a highly publicized matter that took place in nearby Marion County. Also at that time, there were highly–publicized proceedings in the Kiritsis case involving the issue of insanity. Appellant then renewed his motion for sequestration of the jury, and the court granted the motion. The jury was sequestered from that point until the conclusion of the trial. Appellant now argues the jury should have been sequestered for the entire trial.

■ Sequestration of the jury is mandatory only when the defendant faces the potential sentence of death. In *Greenwalt v. State*, (1965) 246 Ind. 608, 616–17, 209 N.E.2d 254, 258, we stated:

"'We feel that a defendant in a case involving the death sentence has the mandatory right to require, upon request, that the jury be kept together during the trial and not be permitted to separate. In all other cases the court has the discretion to determine whether or not a jury should be kept together during the trial or be permitted to separate under such directions and instructions as the court may give. The exercise of such discretion is reviewable by this Court for any alleged abuse, in such event, the defendant must show prejudicial error'" (*quoting Whitaker v. State*, (1960) 240 Ind. 676,

692–93, 168 N.E.2d 212, 220 (dissenting opinion of Arterburn, J.))

Since, as we have pointed out in Issue I above, the defendant did not face the death penalty here, the sequestration issue was discretionary with the court, and we will disturb his judgment only if it is clear that he abused his discretion. *See Drollinger v. State*, (1980) Ind., 408 N.E.2d 1228, 1236; *Norton v. State*, (1980) Ind., 408 N.E.2d 514, 530–31; *Owen v. State*, (1978) 269 Ind. 513, 522, 381 N.E.2d 1235, 1240; *Roberts v. State*, (1978) 268 Ind. 127, 131, 373 N.E.2d 1103, 1106; *Kincaid v. State*, (1976) 265 Ind. 345, 350–51, 354 N.E.2d 199, 203, *cert. denied*, (1977) 430 U.S. 972, 97 S.Ct. 1660, 52 L.Ed.2d 365. *See also Worthington v. State*, (1980) Ind., 405 N.E.2d 913, 917; *Vaughn v. State*, (1978) 269 Ind. 142, 151, 378 N.E.2d 859, 865.

■ The evidence presented to the court outside the presence of the jury indicated that a local radio station was covering this case, and that there was newspaper coverage of the day–to–day developments in the trial. As we noted above, the case was venued out of Morgan County and was tried in Hancock Superior Court. There is no showing that the news coverage amounted to anything more than the usual day–to–day attention a case such as this receives. There is no evidence that any of the media coverage was such, or that the attitudes expressed in the community were such, that the jury was being subjected to undue or improper influences. It appears that the court was properly aware of the situation and did instruct the jury as to their duties with reference to receiving outside information and their duty to decide the case only on the evidence and testimony presented at trial. *See Drollinger v. State*, (1980) Ind., 408 N.E.2d 1228. It is also true that when it became apparent that information regarding the highly–publicized Anthony Kiritsis case, which also involved the insanity issue, might become available to the jury, the trial judge recognized this and again exercised his discretion and sequestered the jury. We find no reversible error shown on this issue.

### III.

■ Appellant Cobb next claims the trial court erred in failing to grant a continuance before the trial began. On September 26, 1977, before jury selection had been completed, Cobb moved for the jury to be dismissed and for the case to be continued because of his illness. The evidence shows that the defendant had suffered earlier from a prostate condition that caused him a great deal of pain and difficulty in urination. This condition resulted in a swelling of his penis, particularly in the foreskin, and, sometimes, swelling and pain in his testicles. On September 8, Dr. Beeson testified that Cobb was suffering from this condition and that examination would be required to decide whether or not surgical repair was necessary. The court heard a great deal of evidence on this issue and determined at that time that a continuance was necessary so that Cobb could be examined and a determination made regarding his need for treatment.

On the following Monday, September 12, the court granted a continuance until September 19. Subsequent continuances postponed the cause until September 26, 1977. On that day Dr. Beeson testified that a urologist had examined appellant, that no operation was necessary to relieve his condition, and that the infection had been completely cured by the time of the most recent examination. Thus, he testified, Cobb would be able to proceed with the trial. Dr. Beeson further testified that there was a change in the drugs that were being administered to Cobb so that they would not have the effect of causing him to be mentally disabled. Dr. Beeson had testified earlier that Cobb was taking Tofranil and codeine, and that the combination of those two drugs would cause a person to be drowsy and perhaps "high", so that he could be mentally disorganized while under their influence. However, he explained on September 26 that he had replaced the codeine with Darvon, and that Darvon and Tofranil "potentiate" one another and would cause Cobb no problems as to mental orientation. The court then overruled the motions for discharge of the jury and for a continuance,

and the trial proceeded with completion of jury selection.

It is apparent that the continuances granted prior to September 26, and the treatment Cobb received during that period, alleviated the problem, because he was able to and did participate in the trial for the next six weeks. Appellant has shown no prejudice from the overruling of his September 26 motion; nor can we say that the trial court abused its discretion by denying any further continuances. *See generally Himes v. State,* (1980) Ind., 403 N.E.2d 1377, 1379; *Lock v. State,* (1980) Ind., 403 N.E.2d 1360, 1370; *Aron v. State,* (1979) Ind., 393 N.E.2d 157, 158; *Schalkle v. State,* (1979) Ind., 396 N.E.2d 384, 387; Ind.Code § 35–1–26–1 (Burns 1975).

### IV.

After Cobb had been apprehended by State Police Officer Strader, he was taken in Strader's car to the Morgan County jail. The two were accompanied by State Police Officer Katter. En route to the jail, Cobb made statements to these officers about shooting the deputy sheriff and about which county the bank branch was located in. At the jail, he answered questions regarding his residence and the identification of the truck he was driving. Appellant moved to suppress all of these statements but the trial court overruled his motions to suppress and permitted the jury to hear them.

■ Appellant contends he could not have knowingly and voluntarily waived his constitutional rights to remain silent because he was under a psychotic reaction from the ingestion of drugs and alcohol. We will consider the issue of the sufficiency of the evidence in regard to the issue of insanity and Cobb's state of intoxication in Issue IX, *infra.* We will say at this point, however, that the court and jury heard evidence of the conditions under which Cobb made the statements, including the ingestion of drugs and alcohol, the amount of alcohol in his blood according to a breathalyzer test given to him, and testimo-

ny of witnesses who observed him at the time of the incident. Further, testimony was heard from two doctors who had observed Cobb for the purpose of determining his mental condition. Officer Katter stated that appellant was calm and acted normally when he was apprehended. Dr. Norman Whitney testified that he saw Cobb on the date of his arrest. Dr. Whitney stated that he appeared "calm, cool and collected" and answered all questions concisely, and that he was able to function in a normal manner. Roger Brown, the bank manager, testified that Cobb spoke with a commanding voice and did not appear to be nervous or excited. Although the evidence on this issue was conflicting, there was sufficient evidence from which the trial court could have found that the statements were made after a knowing, intelligent and voluntary waiver. See generally Holleman v. State, (1980) Ind., 400 N.E.2d 123, 127; Tyson v. State, (1979) Ind., 386 N.E.2d 1185, 1188–89. At that point, the issue of appellant's condition, due to the ingestion of drugs or alcohol, affected the weight, and not the admissibility, of the statements. The court, therefore, properly submitted this question to the jury, and there was sufficient evidence for the jury to decide the question of voluntariness as they did.

Appellant raised as a further ground for suppression of these statements the argument that he had not been properly advised of his rights and thus did not knowingly and voluntarily waive his right to remain silent. Officer Strader took appellant Cobb into custody in the vacant house in the Foxcliff Addition. He testified that as they were walking toward his automobile, he informed Cobb of his rights under Miranda v. Arizona, (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. He said that he carries a card delineating the Miranda rights in his car, but did not have the card with him as he walked with Cobb to the car. He said he gave them from memory, and that Cobb acknowledged that he understood them. Officer Katter was also walking toward Strader's automobile, but was a short distance behind Strader and Cobb and did not hear everything that was said between

them. He said he did hear Strader say something to appellant about having a right to counsel. After they arrived at Strader's automobile and seated Cobb in the right front seat, Strader sat in the driver's seat and Katter sat in the rear seat of the car. Strader then produced his card listing the Miranda rights and read them to Cobb. He asked Cobb if he understood his rights, and Cobb nodded his head up and down.

They then proceeded to leave the area, heading for the Morgan County jail. As they arrived at the entrance gate to Foxcliff Addition, Strader asked Katter whether they should turn right or left to go to Martinsville. At that time, Cobb interjected: "Martinsville? The bank is in Johnson County." Neither officer answered him at that time, but they proceeded to leave the area. Shortly thereafter, they came upon the scene of the shooting, where Officer Dunigan's car, along with several other police vehicles, was still parked. They were forced to stop because one of the cars was in the roadway. When they stopped, Cobb said, "There's that Sheriff's car." Officer Strader responded, "What about that Sheriff, what happened?" Cobb replied, "He pointed a gun at me and I shot him."

█ It is clear, then, that appellant was given his Miranda, rights and indicated that he understood them. Further, the statements made initially by Cobb were not gained by interrogation but were made voluntarily, without prompting by the police. Voluntary statements which are not the result of custodial interrogation, within the contemplation of Miranda v. Arizona, supra, are properly admitted into evidence. Kennedy v. State, (1977) 267 Ind. 322, 325, 370 N.E.2d 331, 332; Lane v. State, (1977) 266 Ind. 485, 487–88, 364 N.E.2d 756, 758; Lockridge v. State, (1975) 263 Ind. 678, 683, 338 N.E.2d 275, 279. See Rhode Island v. Innis, (1980) 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297; Brewer v. Williams, (1976) 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424.

█ After arriving at the jail, Cobb was taken by Strader to an interrogation room and was there questioned by police.

Officer Strader was permitted to repeat for the jury the following conversation he had with Cobb:

Question: Your name is Hiram Irvin Cobb? Answer: Irvin, Irvin, Irvin. Question: Cobb? Answer: Cobb. Question: All right, Hiram, they call you Bud? Answer: Yeah. Question: Bud, I am going to advise you of your rights before we ask you any questions. You must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during the questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you have talked to a lawyer. Do you understand your rights? Answer: Yes sir. Question: Would you like to read that? Fully understand your rights? Would you like to sign the waiver? Answer: No sir. Question: Get ahold of your wife, what's her name? Answer: Her name is Ruth. Question: Ruth Cobb? Answer: Yes. Question: What's her address? Answer: 1416 North Chester. Question: Indianapolis? Answer: Uh huh. Question: Phone number? The answer is 357–1349. Question: Who is the owner of the truck? Answer: Me and the bank. Question: You and the bank. What kind of truck and what year truck is that? Answer: 71 Ford. Question: A Ranger or regular? Answer: Naw, just a sports custom. Question: Sports? Answer: Sports custom. Question: What color is it? The Answer: Candy apple red and white. Question: alrighty, you say you think that bank was in Johnson County? Answer: Yeah. Question: What town was it in? Answer: Waverly. Question: In Waverly? Answer: Well it wasn't right in Waverly. It was on Highway 37 just off of this side north from Waverly.

Question: But it's in Johnson County? Answer: I believe. Question: How did you hurt your arm? Answer: I don't know, I was being shot at. Question: Since you've been captured? Answer: No. Question: No? Answer: Before. Question: Before? Answer: When I was running down the river bank. Question: Who shot at you? Answer: I don't know, I didn't ask him. Question: You didn't ask him? Answer: I was mov'n. Question: You was mov'n. Did you shoot back? Answer: No. Question: When did you shoot at the deputy then? Answer: When he stopped me and put his gun up in the window. Question: He put his gun up in the windshield? Answer: In the window, you know, he was sitt'n like . . . .

Record at 3602–04. At the point where the conversation breaks off, Cobb told the police officers he did not wish to answer any more questions until he had talked to a lawyer. The record shows that the police nevertheless asked some further questions and received answers. However, the trial court properly suppressed all testimony concerning any questions and answers given after Cobb's request for a lawyer. The court did not allow any more of the conversation into evidence, other than that quoted above. *See Michigan v. Mosely,* (1975) 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313. This was the first occasion on which Cobb had indicated in any way that he did not want to talk with police any further and that he wanted to talk with a lawyer. His failure to *sign* a waiver of his rights did not prevent the officers from questioning him further, inasmuch as they had advised him of his rights on three different occasions, he had acknowledged that he understood his rights, and, by his words and actions, had indicated that he wished to waive them. *See North Carolina v. Butler,* (1979) 441 U.S. 369, 97 S.Ct. 1755, 60 L.Ed.2d 286. Moreover, the statement contains facts which Cobb had volunteered previously; it makes reference to the location of the bank and descriptions of the truck he was driving. He had previously told the officers he

wanted the truck turned over to his wife and had described the truck to them as he did in this statement. The statement about shooting the officer was also a repetition of the remark he had made previously in Strader's automobile. We think there is sufficient evidence from which the trial court could find that these statements were voluntarily and freely given by Cobb after he had been fully advised of, and had waived, his constitutional rights. We find no error in admitting these statements into evidence.

## V.

■ When the police officers found Cobb's abandoned vehicle in rural Morgan County, they immediately took possession of it. Certain items were in plain view on the front seat and floor of the truck, and some of these were removed and retained as evidence. The police then impounded the vehicle and had it towed to an impoundment garage. Later that same day, under the direction of State Police Officer Abbott, a further search of the truck was made. Some items were removed as evidence, some of which were in plain view and some of which were not. An additional search was made three days later, on December 29, 1975. Appellant moved to suppress all items of evidence taken from the vehicle at the impoundment garage. The motion was sustained as to the December 29 search, and none of the items found on that date were allowed into evidence. The court, however, overruled the motion in regard to the December 26 search made at the garage. Several items of physical evidence taken from the truck were thus admitted into evidence. Officer Abbott testified that he thought a search warrant had been obtained at the time of the search on December 26, although it was revealed there was not a search warrant present. Abbott designated this as an "inventory search," although he did testify that he made the search not only to inventory the items therein for security reasons, but also to find items of evidence pertaining to this case.

Appellant Cobb argues that the search at the impoundment garage after he was ap-

prehended and in the county jail was improper because it was made without first obtaining a search warrant. Therefore, he claims, all items taken at that time should have been suppressed. We do not agree. We considered this issue at some length in *Whitten v. State,* (1975) 263 Ind. 407, 333 N.E.2d 86. There, the police came upon the abandoned automobile of the defendant after having evidence that he had committed a murder. Police officers testified in that case as to items they observed in the vehicle that gave them probable cause to believe that it was the defendant's vehicle and the one used in the crime. Thereupon, they searched it without a warrant at the scene of its recovery and later had it towed to the police station, continuing the search of the vehicle there. We stated in that case: "The initial search of the automobile ... and its removal to the police station immediately thereafter were entirely reasonable under the exigent circumstances. The subsequent search at the police station was merely a logical continuation of investigative procedure that was lawful in its inception and we see no illegality." *Id.* at 411, 333 N.E.2d at 90.

In this case, when the police found Cobb's abandoned vehicle, they were aware that a police officer had been fatally injured, and they had received descriptions of this vehicle as the one in which appellant left the scene of the bank robbery and in which he was later seen at the scene of the shooting, parked near Officer Dunigan's car. There were items on the seat and floor of the truck which were in plain view from the outside of the vehicle. Under the facts of this case, the police clearly had probable cause to search the truck, and the seizure and admission into evidence of the items found therein were entirely proper. *Chambers v. Maroney,* (1970) 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419; *Pollard v. State,* (1979) Ind., 388 N.E.2d 496; *Gaddis v. State,* (1977) 267 Ind. 100, 368 N.E.2d 244; *Whitten v. State, supra.*

■ Appellant also claims the items recovered at the impoundment garage should have been suppressed because the vehicle

was not secured to the extent that it could not have been tampered with from the time it was taken from the scene until the time the search was made. In fact, it does not appear the doors were locked during the time the tow truck driver had Cobb's truck in his custody and delivered it to the garage, and there were many other police officers, as well as garage attendants, who had access to the vehicle before Officer Abbott examined it. However, this objection to these items of evidence goes more to the weight of the exhibits than to their admissibility. For the purpose of avoiding any possibility of substitution, tampering or mistake regarding exhibits offered as evidence, a foundation must be laid showing the chain of custody and continuous whereabouts of the exhibits. *Moten v. State*, (1978) 269 Ind. 309, 310, 380 N.E.2d 544, 545; *Gaddis v. State*, (1977) 267 Ind. 100, 108, 368 N.E.2d 244, 249; *Wolfe v. State*, (1978) Ind., 383 N.E.2d 317, 318. The State need not exclude all possibilities of tampering, but need only provide reasonable assurance that the exhibit has passed through various hands in an undisturbed condition. *Crosson v. State*, (1978) 268 Ind. 511, 516–17, 376 N.E.2d 1136, 1140; *Gaddis v. State, supra*.

Of course, the test becomes more stringent where the articles in question are fungible articles susceptible to tampering or substitution. Appellant relies on *Graham v. State*, (1970) 253 Ind. 525, 255 N.E.2d 652. That case involved a quantity of heroin that, of necessity, passed through several hands from the time it was taken from the defendant until it was offered as evidence in court. Heroin, however, is a fungible substance. Each quantity must be examined and analyzed to support its very identification as an illegal substance. Thus, it is imperative that the chain of custody must be more strictly established in tracing the whereabouts of such items, in order to insure that no substitution, tampering or mistake occurred during the process. *See Holt v. State*, (1980) Ind., 400 N.E.2d 130.

Thus, as we explained in *Moten v. State, supra*, the standard is "applied with degrees of strictness varying inversely with the potential of the evidence for contamination or misidentification. Where the likelihood of such error is but slight, the evidence will be admitted, and the relative strength of the chain is a matter for the jury to consider." 269 Ind. at 311, 380 N.E.2d at 545–46. *See Crosson v. State, supra*; *Gaddis v. State, supra*. Considering the nature of the items here and the circumstances of their seizure and custody, it was proper to permit the jury to determine the strength of the chain of custody and to give what weight they considered the items to merit. The mere possibility that others may have had access to these items does not "eliminate the reasonable assurance that the exhibits passed through the chain of custody undisturbed and were not tampered with." *Holt v. State, supra*, Ind., 400 N.E.2d at 131. There was no error in the submission of these exhibits to the jury.

## VI.

Appellant complains that he was denied due process of law, in that he was tried under the state bank robbery statute rather than under the federal bank robbery statute. He contends that there was a higher potential penalty provided for in the state statute than the maximum fixed by the federal statute. *Compare* Ind. Code § 35–13–5–1 (Burns 1975) *with* 18 U.S.C. § 2113 (1970). As the State points out, appellant received a determinate sentence of twenty years for the robbery, which is also the maximum penalty provided for by the federal bank robbery statute. It is clear, then, that Cobb was not prejudiced by having been tried under the state statute. More important, trial under the state statute is clearly allowed by law: "If the same act is an offense under both the federal and the state laws it seems to be quite well settled that one may be prosecuted under both." *Heier v. State*, (1921) 191 Ind. 410, 411, 133 N.E. 200. *See Bartkus v. Illinois*, (1959) 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684, *and cases cited therein*; *Richardson v. State*, (1975) 163 Ind.App. 222, 323 N.E.2d 291. Thus, because Cobb was subject to

prosecution by *both* sovereigns, he cannot now complain because he was prosecuted under only the state statute. This argument is without merit.

Cobb also argues that the jury should have been advised that the potential penalty for bank robbery was life imprisonment. He contends that the jury could use this fact to determine what penalty they might give in regard to the first degree murder charge. The jury found Cobb guilty of second degree murder, which carried with it the alternative penalties of life imprisonment or fifteen–to–twenty–five years. The jury recommended a penalty of life imprisonment for the second degree murder conviction, which the court gave appellant. The court, however, granted the State's motion in limine and did not permit the jury to know the penalty for bank robbery. Instead, he advised them that that penalty would be fixed by the court. We stated in *Debose v. State*, (1979) Ind., 389 N.E.2d 272, 273–74: "A jury must determine beyond a reasonable doubt from the evidence presented whether an accused did those specific acts which constituted the crime with which he was charged. In performing this *guilt assessing task* the jury must be oblivious to the legislature's punishment scheme. To hold otherwise, we would be condoning verdicts in which the jury might compromise to the defendant's benefit or detriment in order to reach a certain number of years of imprisonment." (emphasis in original) *See Baum v. State*, (1978) 269 Ind. 176, 379 N.E.2d 437; *Turner v. State*, (1970) 254 Ind. 91, 257 N.E.2d 825. The trial court correctly withheld information regarding the possible sentence for bank robbery.

### VII.

Cobb next argues the prosecutor committed prejudicial acts of misconduct. The deceased police officer, Thomas Dunigan, was riding in Car number thirty–seven at the time of this incident. During the examination of Ed Garner, a Morgan County Deputy Sheriff, reference was made to police radio conversations between Deputy Sheriff Williams, who was in Car number three, and Dunigan, in Car thirty–seven. Defense counsel objected to any testimony by Garner concerning the conversation between Cars three and thirty–seven, unless Williams would be available for cross–examination purposes. At that point, the prosecutor remarked: "Thirty–seven will not be here." Defense counsel objected in this fashion: "I understand, Mr. Grey, and I move that be stricken from the record as being inappropriate." The court made no response to either of these statements, and nothing further was said about it.

The second incident occurred during Cobb's testimony. During direct examination by defense counsel, Cobb testified about relationships he had had with members of his family. Cobb discussed the impact of the deaths of his father and a friend on his emotional stability. He stated he was very upset because he felt he had broken a promise to his father. His father did not want an autopsy performed on him, and Cobb had promised his father that would not happen. After his father's death, however, Cobb's brother made arrangements to have an autopsy performed. Cobb then said on direct examination: "Well, I felt awful bad about Dad because I don't know where he went but someday I got to stand and see him again. Maybe I don't know what I'll tell him. I broke my word to him." On cross–examination the prosecutor questioned Cobb further on this subject. The following exchange occurred:

"A. We had a real argument, yes sir.

Q. And you were worried about the autopsy?

A. It wasn't so much that I was worried about it, it was just that–I gave my dad my word that I wouldn't let them run one on him.

Q. You said something else too, didn't you about you were worried about seeking Dad after the autopsy?

A. I said someday I'd have to see him again and explain to him why I broke my word.

Q. Where you going to see your Dad?

A. In the hereafter I guess.

Q. Hiram, what are you going to tell Tom Dunigan?"

Record at 5141. Defense counsel objected to the question, suggesting to the court that the question was highly unethical and that the court should admonish the prosecutor because they were not in final argument. The court overruled the objection and Cobb answered: "The only thing I can tell him would be what I told my dad, if I done that I'm sorry." Record at 5141.

■ It does not appear that the prosecutor's remark about the driver of Car thirty-seven not being present had much impact on the trial or had any tendency to prejudice Cobb in any serious manner. The trial court did not even acknowledge the exchange; the record does not show that he ruled on it in any manner. The court was not asked to take any further action, and, although appellant complains the jury was not admonished to disregard the remark, appellant did not make any such request. Whether it was not heard by the court, or whether it seemed so unimportant that he did not acknowledge it, is not clear from the record. Likewise, it appears that no one else paid any further attention to it, because nothing further was said about it and the questioning proceeded. Since no request was made to admonish the jury or withdraw the submission of the case, no error can be occasioned by the court's failure to do so. *See Lock v. State*, (1980) Ind., 403 N.E.2d 1360; *Goodpaster v. State*, (1980) Ind., 402 N.E.2d 1239; *Lyda v. State*, (1979) Ind., 395 N.E.2d 776.

■ As to the questioning of Cobb in regard to his attitude concerning the autopsy performed on his father, this matter was brought into evidence by Cobb himself during his direct examination. In lengthy testimony, Cobb attributed the progressive deterioration of his emotional stability to deteriorating family relationships at the time he is accused of having committed this crime. He claimed to have been emotionally unstable because of the ingestion of drugs and alcohol, and he also had a plea of insanity before the jury. This was evidence put in by Cobb for his benefit and in his defense. The State thus had a right to go into the subject on cross-examination. *See Porter v. State*, (1979) Ind., 391 N.E.2d 801. *See also Lock v. State, supra*; *Goodpaster v. State, supra*; *Fortson v. State*, (1978) 269 Ind. 161, 379 N.E.2d 147. In addition to the testimony set out above, there were many questions asked of Cobb as to whether he had killed Officer Dunigan. He admitted that all of the exhibits in evidence were his and that he was in possession of them on that day, but denied that he killed Dunigan, because he said he couldn't kill anybody. This question occurred during cross-examination, and the court exercised its discretion in permitting the prosecution to ask the question and receive the answer that it did. *See, e. g., Ashbaugh v. State*, (1980) Ind., 400 N.E.2d 767; *Gutierrez v. State*, (1979) Ind., 395 N.E.2d 218. Again, defense counsel made no request that the jury be admonished or that the case be withdrawn from the jury. It does not appear that Cobb was put in such grave peril by these remarks that reversible error was occasioned by reason of them. *Stanley v. State*, (1980) Ind., 401 N.E.2d 689, 693; *Lyda v. State*, (1979) Ind., 395 N.E.2d 776, 779–80; *Rock v. State*, (1979) Ind., 388 N.E.2d 533, 536.

## VIII.

■ Appellant Cobb next contends that the trial court erred in not suppressing the in-court identification of him by bank employees Riddle and Brown. Appellant argues that their identification was tainted because he and the others participating in the line-up procedure were forced to make several statements so that voice prints could be heard by the witnesses, and because both witnesses had seen a picture of Cobb in police custody prior to their viewing the line-up. Those in the line-up, including Cobb, were required to repeat several statements that were made by the perpetrator of the hold-up while in the bank. Appellant complains of this process, but does not make clear how the process was unduly suggestive or otherwise improp-

erly done. *See Harris v. State*, (1978) 268 Ind. 12, 373 N.E.2d 149. Cobb's trial attorney was with him during all of the line—up procedure and was given an opportunity to select other persons to appear in the line—up with Cobb.

■ Cobb's complaints regarding the identification testimony of these two witnesses point more to the weight of their testimony than to its admissibility. There were discrepancies in the witness' description of the perpetrator and in their recall of his appearance at the time of the robbery. Such discrepancies affected the weight and credibility of their testimony, which was to be determined by the jury as trier of facts. Both witnesses stated they had seen a picture of Cobb in police custody prior to the lineup, and that they recognized certain characteristics of this person as he appeared in the lineup, including a wound to his arm that was sustained during his capture. The witnesses testified as to their observation of the photograph in the newspapers, as well as to their observation of appellant in the bank and at the lineup. Any suggestion implanted in their minds by having seen Cobb's photograph in the newspaper affects the weight and not the admissibility of their in—court identification. *Gaddis v. State*, (1977) 267 Ind. 100, 107, 368 N.E.2d 244, 249; *Norris v. State*, (1976) 265 Ind. 508, 512, 356 N.E.2d 204, 206. Accordingly, the court properly admitted the in—court identification testimony of these two witnesses.

### IX.

Appellant Cobb tendered a plea of not guilty by reason of insanity, and the jury heard a great deal of evidence on this subject. There was evidence that Cobb did suffer some physical ailments that required him to take drugs to relieve pain and relieve the symptoms produced by his illnesses. The evidence also revealed that some of the ailments appellant suffered related to his prostate and prevented him from having a sexual relationship with his wife. Because of this problem, Cobb was emotionally upset and was known to take drugs, usually diet pills, in addition to those prescribed by his physicians. He also drank alcoholic beverages, and the mixture of the alcohol and narcotics also apparently affected his conduct. Cobb claims this evidence was of such strength that he should have been found not guilty by reason of insanity. Alternatively, he claims the jury should have found that he could not have formed the specific intent to commit the crimes with which he was charged.

■ In truth, these issues were presented to the jury and were decided adversely to Cobb, the jury had a right to make these determinations under the evidence presented to them. There were sufficient evidence presented, even with its conflicts, for the jury to find beyond a reasonable doubt that Cobb was sane at the time of the commission of these acts and that he did have the specific intent to commit the acts. Two court—appointed physicians testified that Cobb was not insane at the time of the commission of these crimes. Dr. Norman Whitney testified that he saw appellant on the date of his arrest and that he appeared calm and collected, answered all questions, and was able to function in a normal manner. Doctors Dwight Schuster and John Kooiker also concluded that Cobb was not suffering from a mental disease or defect on the date of the offense. Roger Brown, the bank manager, and Rodd Katter, a State Police officer, testified that Cobb did not act abnormal and that he appeared calm to them. Although appellant objects to this testimony of the lay witnesses, a lay person may give an opinion as to sanity, and it is competent evidence for the jury to use in making their determination. *Lonson v. State*, (1980) Ind., 406 N.E.2d 256, 259; *Lynn v. State*, (1979) Ind., 392 N.E.2d 449, 453.

The extensive evidence of Cobb's emotional stress, due to his ailments and the drugs and alcohol he took because of his ailments, does not raise a question for our review, because there was also a great deal of evidence that, in spite of these problems, Cobb was legally sane at the time of the commission of these acts. These conflicts in

the evidence were to be resolved by the triers of fact along with all other facts and circumstances presented to them. *Jacks v. State,* (1979) Ind., 394 N.E.2d 166, 172; *McCoy v. State,* (1979) Ind., 393 N.E.2d 160, 161. The court fully instructed the jury regarding the State's burden of proof, the various defenses Cobb presented, and the manner in which opinion evidence should be evaluated. One of the verdict forms the jury had before it allowed for a finding of not guilty by reason of insanity. Thus, this issue was fully presented to the jury, and there was substantial evidence to support their verdict.

### X.

▮ Appellant alleges the trial court erred by refusing to give nine of his tendered instructions dealing with a variety of issues and concepts. The record shows that the trial court gave other instructions on these same subjects. There were as many as two or three instructions on each of these subjects, and all of the content of Cobb's tendered instructions was covered in the instructions given by the court. The court adequately and substantially instructed the jury in all of these areas as well as in many others. The trial court is not bound to give an instruction, although it may be a correct statement of the law and applicable to the evidence, if the substance thereof is covered by other instructions which are given. *Hauger v. State,* (1980) Ind., 405 N.E.2d 526, 527–28; *Brown v. State,* (1979) Ind., 390 N.E.2d 1000, 1004. Since the subject matter of all of the tendered instructions which were refused were adequately covered by other instructions, the court did not err in refusing those instructions.

### XI.

▮ In its preliminary instructions and final instructions, the trial court gave the following instruction:

"The Court now instructs you, in this a criminal case, you are the exclusive judges of both the law and the facts. The Instructions of the Court are advisory only, and you may disregard them entirely and determine what the law is for yourselves; and, if you find that any instruction does not, or that any instructions do not state the law correctly, it is your province and your duty to decide the case according to the law as you shall find it to be.

If, however, you shall have no well defined opinion as to what the law is relating to any particular matter or matters in issue in this case, then, in determining the law, you should give the instructions of the Court respectful consideration.

While the Constitution of this State makes the jurors the judges of the law as well as of the facts, this does not mean that the jurors may wilfully and arbitrarily disregard the law. It means that jurors under their oaths should honestly, justly, and impartially judge the law as it exists. It does not mean that jurors may so judge the law in any case so as to make it null and void and of no force; but, they shall so judge the law as to give it a fair and honest interpretation, to the end that the law in each and every case may be fairly and honestly enforced.

The facts must be judged and found by the jury from a careful consideration of all the testimony given by the witnesses in the case and under your oaths you have no right to arbitrarily disregard either the law or the facts in this case."

Record at 2278–79, 5462–63. Appellant objected to this instruction before the trial court, and argues here that it gave the jury an option to disregard all law entirely in arriving at their decision. He further argues that it is confusing in that it does not clearly define to the jury what its responsibility is with regard to determining the law.

We recognize this instruction as one we commonly refer to as "boiler plate," and one properly given to juries in final instruction in criminal cases. The instruction properly tells that it is their duty and right under the Constitution to determine what the law is. It is a right and power given to criminal juries so that they are not bound to follow the law as presented to them in

instructions by the court where it is apparent that the court is improperly instructing them. This area was very well explained by this Court in *Beavers v. State*, (1957) 236 Ind. 549, 564–65, 141 N.E.2d 118, 125, where we said:

"To summarize: Although the constitution gives the jury the right to determine the law in criminal cases, it does not follow, nor is it true, that it is an 'exclusive' right. It is a coordinate right to be exercised with that of the judge or court. Neither does it follow, nor is it true, that the jury is the judge of the law at every step in the proceedings. Neither does it follow, nor is it true, that it is totally irresponsible in determining the law, and has no duty in the exercise of that right to seek the law from the best and most reliable source available, namely the court. A jury may not cast aside such advice or instructions lightly, and should be so instructed in view of their general lack of such knowledge. A consciousness of their responsibility, oath and duty in that respect is an aid to the proper performance of their constitutional duty. Nevertheless upon final analysis after being so informed and cautioned the jury had the power to go its own way, and determine the law for itself when it renders a verdict. If the defendant is found guilty its determination of the law, if in error, will be overridden by the court's better understanding of the law in the interest of justice and constitutional law."

*See Smith v. State*, (1968) 250 Ind. 125, 235 N.E.2d 177; *Sankey v. State*, (1973) 157 Ind.App. 627, 301 N.E.2d 235. The instruction given by the trial court in this case complies with the principles set out in *Beavers v. State, supra.* Although the issue is, by its very nature, confusing to lay people who sit on juries, this instruction nonetheless accurately explains the law and does so in a manner in which the jurors could reasonably be expected to understand and apply. The trial court properly gave this instruction.

 ▮ Instruction number fifteen, which was given preliminarily and finally by the trial court, read as follows:

The credibility of a witness may be attacked by introducing evidence that on some former occasion the witness (made a statement) (Made a written statement) in former testimony testified) or (acted in a manner) inconsistent with his testimony in this case. Evidence of this kind may be considered by you in connection with all the other facts and circumstances in evidence in deciding the weight to be given to the testimony of that witness.

Record at 5495. Appellant Cobb objects to that part of the instruction that advises the jury that the credibility of a witness may be attacked by introduction of evidence that shows on some former occasion that the witness acted "in a manner inconsistent with his testimony in this case." He argues that there was no evidence in this case from which the jury could have properly applied this instruction to him, and that he thus was prejudiced by this allegedly confusing instruction. Clearly, by its general language, this instruction is not directed specifically at Cobb, but refers to all witnesses. The instruction properly states the law, in that the jury does have a right to consider evidence that a witness acted in a manner which is inconsistent with his testimony. In addition, there are instances in which the jury could have found or inferred that Cobb's conduct was contrary to his testimony. Thus, the jury could have properly applied this instruction to him. In any event, the instruction is a general one directed at the testimony of all of the witnesses, and we failed to see that its content prejudiced Cobb. As we have said many times, instructions should be read as a whole, and the jury must consider the impact of the entire charge in reaching its verdict. This Court must examine the instructions in a like manner in deciding whether reversible error was committed by the giving of a particular instruction. *See, e. g., Henderson v. State*, (1979) Ind., 395 N.E.2d 224, 228; *Porter v. State*, (1979) Ind., 391 N.E.2d 801, 814; *Brannum v. State*, (1977) 267 Ind. 51, 58–59, 366 N.E.2d 1180, 1185. The jury in this case was well

instructed, and we fail to see any way in which the giving of this instruction prejudiced appellant.

## XII.

 Appellant was charged with first degree murder and found guilty of the lesser–included offense of second degree murder. The penalty for first degree murder at the time of this trial was life imprisonment. For second degree murder, the sentence was to be either life imprisonment or a term of not less than ten nor more than twenty–five years. The jury recommended a life term, and the court imposed this sentence on appellant. He contends the trial court erred in giving the life sentence, because the jury was allowed to select between the alternative penalties without the benefit of standards or guidelines. Therefore, he argues, he was denied due process and equal protection of the law. Generally, the fixing of penalties for crimes is the proper function of the legislature. Such penalties will not be disturbed by the judiciary unless they exceed constitutional boundaries. *Thomas v. State*, (1976) 264 Ind. 581, 585, 348 N.E.2d 4, 7; *Rowe v. State*, (1974) 262 Ind. 250, 256, 314 N.E.2d 745, 749. We must also remember that the jury's decision was merely a recommendation, one which was not binding on the sentencing judge. *See* Ind. Code § 35–13–5–1 (Burns 1975). Further, we are not willing to say the jury was totally without the "guidelines" which appellant would require. Presumably, they made their decision with an eye toward the facts of the case as they found them to be.

 Appellant also argues that the life sentence in this case constitutes cruel and unusual punishment. We decided this issue contrary to appellant's position in *Brown v. State*, (1974) 261 Ind. 619, 308 N.E.2d 699. In that case, we stated that a lesser-included offense must not carry a greater sentence than the greater offense, but that a lesser–included crime may have a penalty as great as the greater crime. *See Brown v. State*, (1973) 261 Ind. 169, 301 N.E.2d 189; *Emery v. State*, (1973) 261 Ind. 211,

301 N.E.2d 369; *Dembowski v. State*, (1968) 251 Ind. 250, 240 N.E.2d 815. The penalty in this case does not exceed constitutional boundaries, and the court did not act improperly in choosing the sentence recommended by the jury.

Finding no reversible error, we affirm the judgment of the trial court.

GIVAN, C. J., and HUNTER and PRENTICE, JJ., concur.

DeBRULER, J., concurs with separate opinion in which PRENTICE, J., also concurs.

DeBRULER, Justice, concurring.

The instant case involves the question of whether appellant's statement that he had shot the deputy sheriff, made en route to jail, was properly admitted in evidence. I join in the judgment of the Court, but find it necessary to further examine the question of whether it may be properly considered a volunteered statement, and thus beyond the purview of the case of *Miranda v. Arizona*, (1966) 384 U.S. 463, 86 S.Ct. 1602, 16 L.Ed.2d 694.

Two slightly divergent descriptions of the events occurring between the time appellant was arrested in the housing subdivision and the time he arrived at the Morgan County jail are presented in the record. Officer Katter presented one, the one relied upon mainly and quoted in the majority opinion. Officer Strader presented another. After Katter and Strader took appellant into custody in the subdivision, Strader read a complete advisement of *Miranda* rights to appellant from a card, identified at trial as State's Exhibit 67, and introduced into evidence at trial. Appellant was in the police car in the front seat alongside Strader, and Officer Katter was in the rear seat. During the travel from that point to the jail, Officer Strader was always in a better position to hear and observe appellant than was Officer Katter.

The car in which the three were traveling passed out of the housing subdivision, turned left and travelled a few hundred feet when it was stopped for a few mo-

ments by a police roadblock which had been set up to protect the scene of the shooting of the deputy sheriff. The car then proceeded on through the roadblock, past the car in which the deputy sheriff had been driving. It was during this very short period of time that appellant allegedly made the challenged incriminating admissions.

Regarding these statements, Officer Katter testified as follows:

"Q. While you were in the area of that Deputy's car, did Mr. Cobb say anything to you?

A. Mr. Cobb said, there's that Deputy's car. At this time Officer Strader said—let me retract that. Mr. Cobb said, there's that sheriff's car. At this time Officer Strader said, what about that sheriff, what happened and the reply to that was he pointed a gun at me and I shot him."

This version of the conversation places appellant in the position of answering a specific question posed by Officer Strader and places in considerable doubt the issue of whether the incriminating response can justly be considered a volunteered statement. During cross–examination this officer stated that he had made no notes regarding this conversation and that he did not recall the exact conversation.

Officer Strader on the other hand testified that as the three approached the exit from the subdivision he asked which way he should turn to get to the Morgan County jail and Katter motioned from the back seat for him to turn left. As he did so, appellant then made the first incriminating statement:

"Q. What did he say?

A. Said the bank wasn't in Morgan County, was in Johnson County."

The car proceeded on and in short order through the roadblock and past the deputy sheriff's car. Strader continued his testimony:

"Q. When was the next time anybody in the car made a statement?

A. Shortly after that, right after we had passed that area there.

Q. And who made a statement?

A. Mr. Cobb.

Q. What did he say?

A. He said I know why you're taking me to Morgan County now, he said, it was because of that sheriff I shot.

Q. Did you ask him anything at that time?

A. No.

Q. Was anything else said at that time?

A. No."

According to this version of events, appellant's admission that he had shot the deputy sheriff, tantamount to a complete confession of the killing, was not made in response to any inquiry by Officer Strader, but to his sight of the victim's auto. It is apparent that the testimony of Strader, if believed, would support the conclusion that appellant's statement was volunteered, and was therefore admissible without proof of compliance with the requirements of *Miranda* governing the use by the State of the fruits of custodial interrogation.

PRENTICE, J., concurs.