ORLANDO FAIR *v.* STATE OF INDIANA.

[No. 375S56. Filed June 15, 1977. Rehearing denied August 30, 1977.]

*John M. Lyons,* of Valparaiso, for appellant.

*Theodore L. Sendak,* Attorney General, *Walter F. Lockhart, Sheldon A. Breskow,* Deputy Attorneys General, *Robert F. Colker,* Assistant Attorney General, for appellee.

PRENTICE, J.—Defendant (Appellant) was charged by indictment with first degree murder for hire, Ind. Code § 35-13-4-1(b) (Burns 1975), for the shooting death of Robert Warren, first degree murder (not for hire), Ind. Code § 35-13-4-1 (a) (Burns 1975), for the related shooting death of Otis Johnson and conspiracy to commit a felony, to-wit: conspiracy to murder Robert Warren, Ind. Code § 35-1-111-1 (Burns 1975). He was tried by a jury and found guilty upon all three counts, for which he was sentenced to death for the murder of Robert Warren, to life imprisonment for the murder of Otis Johnson and to imprisonment for not less than two nor more than fourteen years for the conspiracy. In this direct appeal, the following alleged errors are assigned:

(1) That none of the verdicts were sustained by the evidence.

(2) The denial of his motion to dismiss the indictment based upon participation in the grand jury proceedings by unauthorized persons.

(3) That a postal card inferentially written by the defendant and an exemplar of his handwriting, taken from his personal effects following his arrest, were improperly admitted into evidence.

(4) That the defendant was illegally arrested and that incriminating evidence obtained in consequence of such arrest was admitted.

(5) That the statute under which the defendant was charged for the murder of Robert Warren is unconstitutional.

On January 31, 1974, the decedents, Robert Warren and Otis Johnson were shot to death while at the Lighthouse Methadone Clinic in South Bend, where they were procuring written authorization for treatments. Hardin Lanier, an employee of the clinic, was an eyewitness. The assailant walked into the room where the three were transacting their business and inquired of Mr. Lanier as to whether or not he knew Robert Warren. Simultaneously, the assailant pulled a gun from a paper sack and fired several times, killing both Warren and Johnson. The witness, Lanier, immediately escaped from the room but saw the assailant leave the clinic by way of the front entrance. The paper sack was left behind on the floor of the room where the shooting had occurred. The reports from the gun were not loud but sounded more as would shots from a B-B gun.

At the trial, the witness, Lanier, gave a general description of the assailant as being between five feet ten inches and six feet tall, weighing about one hundred sixty pounds, of medium build, wearing a mid-thigh length trench coat, and having dark shoulder length hair. He appeared to the witness to be between thirty and thirty-five years old and to be white, but he was neither real light nor real dark of complexion. He did not have gray bushy hair nor an Afro-style hair cut. The witness did not remember the assailant to be wearing glasses or as having a bushy mustache, such as was worn by the defendant at the trial. The witness saw the assailant only momentarily and was very excited at that time. He was of the opinion that he would not be able to identify the assailant if he should see him again but that the defendant was not the one he had seen kill the decedents.

\* \* \*

## ISSUE I

That two crimes of first degree murder had been committed has been clearly established and has not been dis-

puted. The defendant's insufficiency claim, in regard to these convictions, is that there was insufficient evidence that he was the one who committed the crimes.

"When the sufficiency of the evidence is raised as an issue upon appeal, this Court will consider only that evidence of probative value most favorable to the State, together with all logical and reasonable inferences which may be drawn therefrom. If such evidence and inferences would permit a reasonable trier of fact to find the existence of each element of the crime charged beyond a reasonable doubt, the verdict will not be disturbed." *Baum* v. *State*, (1976) 264 Ind. 421, 345 N.E.2d 831 at 834, 835, and cases there cited.

"As this Court has repeatedly emphasized, it will not on appeal judge the weight of the evidence or the credibility of the witnesses. Lottie v. State, (1974) 262 Ind. 124, 311 N.E.2d 800; Brown v. State, (1974) 261 Ind. 619, 308 N.E.2d 699; Turner v. State, (1972) 259 Ind. 344, 287 N.E. 2d 339; Gibson v. State, (1971) 257 Ind. 23, 271 N.E.2d 706; Fuller v. State, (1971) 256 Ind. 681, 271 N.E.2d 720." *Rosell* v. *State*, (1976) 265 Ind. 173, 352 N.E.2d 750, 751.

In view of the law of appellate review above quoted, it is unnecessary to review all of the evidence, much of which we acknowledge was conflicting and of dubious credibility. Rather, we will relate that evidence which contrary to the defendant's position warranted the jury in returning guilty verdicts upon all counts.

During the late morning on January 30th, a man of average height and wearing a dark top coat walked into an automobile service garage located directly behind the Methadone Center and obtained a wire coathanger with which to fix his muffler. He was clean shaven, dark complexioned and had straight black hair. On the following day, the same man was seen, from the service station, walking across a vacant lot towards the Center. On this occasion, he was carrying a large paper sack. The time of day of this occurrence was not fixed precisely, but it took place in the forenoon. The vacant lot adjoins the Methadone Center premises and extends to the alley that separates the Center premises and the garage premises.

From a hairdressing salon located diagonally across the street from the Methadone Center, a man was observed on January the 30th standing for most of the day on the porch of an apartment building situated next door to the Center. On January 31st, the same man was again observed standing in the same place during most of the morning. At about 11:00 a.m. he moved over to the Methadone Center, looked both ways and "* * * kind of slipped in." He was carrying a brown paper bag. This man answered the same general description as did the man who was observed from the garage—"three-quarter length trench coat." Hair, "medium length, dark, fairly well groomed." Height, "I guess around five eleven." Build, "medium, I guess maybe a little heavy. He looked white."

About two minutes after the above described man was seen entering the Center, a man of the same appearance ran north alongside the east side of the Center building. On this occasion, the sack was not seen.

The State's theory of the case was that the defendant conspired with Larry Eddington, Edward Landau, Sr. and Edward Dicks to kill Warren, who was a material witness in narcotics prosecutions pending against Eddington, Landau, his son Edward Landau, Jr. and Dicks, that the defendant carried out the mission and in the process also killed Otis Johnson.

The evidence presented, when viewed in a light most favorable to the State, disclosed that the defendant was released from prison January 11, 1974. While there, he became acquainted with Landau, Jr., who was serving a state sentence for manslaughter and awaiting a federal sentence for trafficking in narcotics.

Landau, Jr., owned a house at 2180 Hollywood Place in South Bend, in which Landau, Sr. had resided from April to October, 1973. About September 1, 1973, Eddington moved in with Landau and continued to reside there after Landau departed. Dicks had also resided there with Landau and re-

mained with Eddington after Landau moved. In mid or late January, the defendant contacted Landau by telephone. Landau knew of him and had been asked by his son to help him out if he could. Landau met the defendant and took him to 2180 Hollywood Place and arranged for him to stay there temporarily with Eddington.

Landau and Eddington were operating a heroin sales business from the Hollywood Place premises. Landau was procuring the contraband, and Eddington was disposing of it. Eddington was, himself, an addict and was using some of the heroin supplied by Landau. On at least two occasions, Eddington supplied the defendant with some of the heroin and the defendant sold it in Indianapolis, where he was also staying part time. Following a discussion among the defendant, Eddington and Landau, wherein it was inferred that Eddington had been using part of his allotment for himself and diluting the portion that he sold, the defendant approached Landau with the accusation that Eddington was ruining the business and a suggestion that the business be moved to Indianapolis. Landau had announced his intention to quit the business, and Eddington had another source of supply.

Robert Warren, one of the victims of the homicides, had been a customer of Landau, Sr. and Eddington, and they believed that he had informed on them and would be the State's star witness against them in the pending prosecutions. Warren had admitted to Eddington that he had informed the authorities but explained that he was "conning" the police.

Edward Dicks also resided at the Hollywood Place house with Landau and Eddington. He remained after Landau moved. Another person, Bobby Kinch, also resided there until shortly prior to the murders when he and Eddington had a fight and Eddington "threw him out."

Kinch was an alcoholic and drug addict. He was described as Eddington's "flunky" and Eddington as Kinch's "keeper." On one occasion, Eddington asked Kinch to kill Warren, but Kinch refused. After the murders, Kinch made inquiry of

Eddington concerning them and Eddington replied, "It happens that way." and smiled. On another occasion in late January, Kinch threatened to kill Dicks, Landau, and Landau's wife. He stated that he had killed for Eddington before and would do it again. Dicks reported this to Eddington, and it was this that prompted the fight between Kinch and Eddington.

About a week before the murders, Kinch told Landau something that caused him to suspect that Eddington and Kinch were going to kill Warren. Landau confronted Eddington with this, and Eddington denied it. In that conversation, however, Eddington stated that Warren would not go to court. He said that no one went to court against him and that "usually a busted leg or a broken head would do it." On another occasion, when Eddington and Landau were conferring with their lawyer, Eddington asked the lawyer "how the trial would go if the witness came up missing."

During the second week of January, a conversation between Eddington and Landau was overheard by Kinch. Eddington said that Warren was the only person who could put him in the penitentiary and Landau replied, "Let me know a day ahead of time, because I want to find some place to be."

Kinch owned an automobile which he loaned to Eddington in late January. It was returned to him in February, after the murders. This automobile was inspected in early February by a police detective investigating the murders, and it was then observed to have its exhaust system partially supported by a wire coathanger. It was not in that condition at the time Eddington borrowed the vehicle.

Eddington was a fancier of guns and kept several at the Hollywood Place address. On January 31st, he and Dicks moved them to another house, because Landau said that he did not want them around the place.

During the third week in January, Kinch observed the defendant and Eddington in the basement of the Hollywood Place residence practice firing an automatic gun with a

silencer attached. Eddington asked the defendant how it felt, and the defendant replied, "fine." Eddington had Kinch go outside to determine how much noise the firing made. It was not loud, "like a marble hitting the floor * * *." Ammunition casings found at the scene of the crime had been fired from the same gun as had certain casings found at the Hollywood Place house.

Eddington, Landau and the defendant were arrested at or about the same time and placed in the Michigan City lockup. Ultimately, they were transferred to the Michigan City Prison for security reasons. An hour or so later, Eddington died. Landau had read newspaper accounts of the killings and knew that they had been accomplished by means of a gun with a silencer. He knew or assumed that the defendant had committed them, and he expressed his concern to the defendant, saying that he would be in trouble if the weapon were found, because he was present when Eddington purchased it and had even given Eddington part of the purchase money. The defendant told Landau, "Just be cool, don't get excited. They ain't got nothing, their case just died, don't worry about it, everything is covered. They got the wrong car, they don't have the wig and they haven't got the guns so everybody is going to walk." He said further that he had burned the wig and buried the gun.

Four days following the murder, Edward Landau, Jr., still reposing in the State Prison, received a postal card purporting to have been sent by one Dale Martin, an acquaintance from whom Landau, Jr. was authorized to receive mail. The card, however, had not been sent by Martin but by someone else who had signed his name. The address was printed, although the message was in script. In the opinion of the expert handwriting witness, the printing in the address matched exemplars of printing by the defendant. The message upon the card included, "I took care of that little job as you probably know."

Much of the evidence related above came from the mouths of unsavory associates of the defendant who had an interest in

the proceedings. Landau and Dicks were co-defendants, but the indictment was dismissed as to them in return for their testimony. Kinch had served a prison sentence for assault and battery with intent to kill and was a narcotics addict and alcoholic. Counsel has labored hard to pursuade us that the evidence was insufficient—particularly with reference to the identification testimony of those persons who had witnessed the suspected killer at and near the scene at the crucial times.

There was substantial evidence that the murderer was more likely to be Eddington than the defendant. There was undisputed testimony that the killer had long hair, no mustache and wore no spectacles—characteristics that were not common to the defendant either prior to the killing or at the time of his arrest, five weeks later. Nevertheless, there was also probative evidence from which the jury could have found that the defendant sought to get into the narcotics business with Landau and/or Eddington, that Eddington wanted Warren dead to eliminate him as a witness and that Landau, if he did not in fact agree, at least had no objections. Kinch was solicited to commit the murder but declined, whereupon Eddington turned to the defendant. The defendant was agreeable, as it strengthened his connection with Eddington and Landau. In carrying out the deed, he disguised himself by shaving his bushy mustache, which he promptly re-grew, by leaving off his spectacles and by donning a wig.

While stalking his quarry, the day prior to the murder, the defendant had trouble with the exhaust system of Kinch's automobile, which Eddington had supplied, and he repaired it with a coathanger wire obtained from the garage behind the Methadone Center. He stood in wait in the doorway of the apartment house until Warren entered the Center. He then followed him inside and consummated the assassination. Otis Johnson either got in the line of fire intended for Warren, or the defendant eliminated him as a witness to the killing.

The foregoing version may be incorrect, but it is altogether a reasonable version and is supported in every particular

by substantial evidence of probative value. Under the case law hereinbefore cited and assigning to the jury the task of assessing the credibility of the witness and the weight of the evidence and to us merely the responsibility and authority to review and to reverse for errors of law, as opposed to reasonable differences of opinion, the verdicts cannot and should not be disturbed.

## ISSUE II

The defendant entered a plea of not guilty but later moved to withdraw it for the purpose of challenging the indictment. The stated grounds for the challenge to the indictment was that unauthorized persons were present during the Grand Jury proceedings and participated in the interrogation of witnesses, thus prejudicing the defendant's right to a fair and impartial determination of the probable cause. The State challenges the defendant's right to here assign the denial of a motion to dismiss, such challenge being upon the basis that no such motion was filed and that the trial ruling complained of was addressed to a motion to withdraw the plea.

Indiana Code § 35-3.1-1-4 (Burns 1975) provides that, except as otherwise provided, a motion to dismiss an indictment shall be made prior to arraignment and plea and that a motion made thereafter may be summarily denied if based upon an allegation that the Grand Jury proceedings were defective. The court, however, in considering the motion to withdraw the plea, heard arguments of counsel addressed to the merits of the Grand Jury proceedings, reviewed the Grand Jury minutes and, in denying the motion, specifically stated that the minutes revealed no prejudice to the defendant. Thus it appears that the court treated the motion to withdraw as a motion to dismiss. Accordingly, we will treat the matter upon its merits.

From a strict reading of the statutory provisions which specifically authorize the presence of the prosecutor before the Grand Jury, Ind. Code § 35-1-15-23 (Burns 1975), and a clerk-stenographer, Ind. Code § 35-1-15-10 (Burns 1975), the

presence of the police officers appears to be erroneous, as clearly unauthorized. Also see *State* v. *Bates,* (1897) 148 Ind. 610, 48 N.E. 2. But in that case, this Court said:

> "It is the rule that the presence of a stranger in the grand jury room during the investigation of a criminal charge is not sufficient to abate an indictment, unless it appears that the person indicted was thereby injured in his substantial rights. Shattuck v. State, 11 Ind. 473 (sic)." Also quoted in *Rennert* v. *State,* (1975) 263 Ind. 274, 329 N.E.2d 595.

In Indiana there is no *per se* rule presuming prejudice when unauthorized persons appear before the Grand Jury, or even when those persons participate in the interrogation of witnesses. *Rennert* v. *State, supra.* This differs from the federal rule relied upon by the defendant. In the case before us, the trial court based its ruling upon the State's stipulation that certain police officers participated in the questioning of witnesses before the Grand Jury, and upon a reading of the Grand Jury minutes. But, the Grand Jury minutes are not included in the record before us. We can consider nothing that is not contained in the record. *Burkhart* v. *Ogle,* (1890) 126 Ind. 599, 26 N.E. 152; *Bernard's Administratrix* v. *Cox,* (1865) 25 Ind. 251.

## ISSUE III

In order to prove the handwriting on the postal card previously mentioned as being that of the defendant, the State offered into evidence its Exhibit 13, a handwriting exemplar that had been taken from the defendant at the time he was booked and jailed. The expert's opinion had been based upon a comparison of the exemplar and the postal card. The defendant objected upon the grounds that Exhibit 13 had been taken from among his personal effects confiscated for safekeeping following his arrest and preparatory to incarcerating him. The question presented is whether or not the belongings taken in an "inventory search" and held for safekeeping pending pretrial incarceration of an accused may be examined without the benefit of a search warrant.

In *Farrie* v. *State,* (1971) 255 Ind. 681, 266 N.E.2d 212, this Court held (DeBruler, J. dissenting) that a search incidental to a valid arrest is lawful, regardless of what it reveals and is no less valid when conducted by a jailer when an accused is booked and confined. One of Justice DeBruler's objections to the *Farrie* opinion was that subsequent to the inventory search and confiscation, Farrie's personal effects were exhibited and utilized in a random search for evidence of other criminal activity. That aspect is not present in the case before us. The evidence sought and utilized following the inventory search here was directly related to the crime for which the arrest was made. In this respect, the police action appears to be approved by *Chambers* v. *Maroney,* (1970) 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419, *Luckett* v. *State,* (1972) 259 Ind. 174, 284 N.E.2d 738, and *Whitten* v. *State,* (1975) 263 Ind. 407, 333 N.E.2d 86. In each of those cases, a subsequent search of the suspects' automobile, conducted at the stationhouse subsequent to the arrest was held to be merely a logical continuation of investigative procedures that were lawful in their inception.

The defendant, by his brief, seeks to argue that the exemplar used for the handwriting was not conclusively shown to have been written by him. This is a basis differing from the one offered at trial and need not be here treated. *Tyler* v. *State,* (1968) 250 Ind. 419, 422, 236 N.E.2d 815, 816; *Rector* v. *State,* (1971) 256 Ind. 634, 271 N.E.2d 452, 454. It is clear, however, that this argument would apply only to the weight of the evidence and not to its admissibility.

We are unable to follow the defendant's argument with respect to the admissibility of the postal card. He apparently seeks to attack its relevance, and asserts:

"* * * the only evidence concerning the card was that the name signed to it had not been placed there by the person whose name was used. The evidence indicates that William Cowell had the card, but there is nothing in the record to indicate who the original addressee was or the recipient. Not knowing who the original addressee was, the significance of the quoted content of the card ceases to

exist, if indeed it ever did exist. All we know, is that out of the bowels of the Indiana State Prison emerges a greeting card with a rather inscrutable and apparently innocuous comment thereon. We know that it came into the hands of the police from a convicted murderer who subsequently escaped, and we know that the author of the comment on the card appears to be the same person who authored some papers that were found in Orlando Fair's possession. Counsel respectfully suggests that even members of this Court may well have names and/or addresses in their possession written by others. The FBI handwriting expert specifically testified that he did not know who wrote the card nor who wrote the slips of paper found in Orlando Fair's wallet. And, of course, no one testified as to who the author of either of these documents was.

"It is respectfully suggested that under the circumstances, there being a total lack of foundation connecting the 'card' with Orlando, that the card should not have been admitted into evidence as it was totally devoid of any probative value and lacked materiality and relevance."

We first correct the statement that there is nothing in the record to indicate who the addressee was. The card was itself in evidence and was addressed to Edward Landau, Jr.

The relevance of the postal card is the inference that it was written by the defendant, using a false name and addressed to a co-conspirator. That the State failed to show how it obtained possession of the card from the addressee, or even that the addressee had ever received it, is immaterial to the proposition for which it was admitted. Its admissibility was conditioned upon the ability of the State to adduce evidence supporting the inference that it was written by the defendant, which it did. There was no error in admitting the card into evidence.

## ISSUE IV

Defendant here seeks, for the first time, to question the legality of his arrest. No in-trial motion addressed to such question appears in the record, nor was the issue presented by the motion to correct errors. The issue, therefore, is deemed waived. Absent fundamental error, this Court will not go behind a waiver and

litigate for the first time that which could have been litigated below. *Cooper* v. *State,* (1977) 265 Ind. 700, 359 N.E.2d 532; *James* v. *State,* (1974) 261 Ind. 495, 307 N.E.2d 59; *Pinkerton* v. *State,* (1972) 258 Ind. 610, 283 N.E.2d 376.

We have repeatedly and consistently held that a valid conviction may rest upon an invalid arrest. *Adams et al.* v. *State,* (1974) 262 Ind. 220, 314 N.E.2d 53, and cases there cited. If, as claimed by the defendant, some evidence may have come into the record in consequence of an invalid arrest, such, nevertheless, does not elevate the arrest to the stature of fundamental error. The proper objection was required to have been made at the time the evidence was offered, which was not done in this case.

## ISSUE V

That the capital punishment provision under Ind. Code § 35-13-4-1 (Burns 1975) is unconstitutional, under the holding of the Supreme Court of the United States in *Woodson* v. *North Carolina,* (1976) 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944, was decided by this Court in *French* v. *State,* (1977) 266 Ind. 276, 362 N.E.2d 834. It does not follow, however, that such mandates a new trial or release of the defendant.

It is only subsection (b) of the statute that is unconstitutional, and it is separable from subsection (a), which remains viable and provides the punishment for traditional murder and felony murder. But for the unconstitutionality of subsection (b) the defendant could not have been charged under (b) and found guilty of first degree murder under (a). However, in view of the invalidity of (b) the defendant clearly stood charged under (a). The allegation of having been hired was surplusage and could have been stricken, but the indictment was nevertheless valid under *Torphy* v. *State,* (1918) 187 Ind. 73, 118 N.E.2d 355.

We find no reversible error. The cause is remanded to the trial court, however, with instructions to vacate the sentence

of death entered upon the verdict under Count I of the indictment, i.e. first degree murder of Robert Warren, and to sentence the defendant thereunder to life imprisonment.

Givan, C.J. and Hunter, J., concur; DeBruler, J., concurs with opinion; Pivarnik, J., not participating.

CONCURRING OPINION·

DEBRULER, J.—I am at odds with the majority opinion in but a single respect. The opinion seeks authority to order a new sentence of life imprisonment in lieu of the penalty of death, and finds it in subsection (a) of the first degree murder statute. Ind. Code § 35-13-4-1 (Burns 1975). To justify this application of subsection (a), the opinion transforms appellant's conviction into one under subsection (a). This is highly irregular. Subsection (a) and subsection (b) proscribe separate offenses. It is beyond question that appellant was charged under subsection (b) of the statute tried under subsection (b), and sentenced to die by electrocution under subsection (b). I do not believe that this irregular reasoning should stand as the legal basis for this Court's order.

In my view, it is unnecessary to look beyond subsection (b) of the first degree murder statute to find authority for today's order. The bar of the federal Constitution applied today, does not affect the integrity of appellant's conviction for first degree murder under subsection (b), but only prevents imposing the sole penalty provided by the statute for appellant's conviction for first degree murder, namely, death. The conviction stands. But appellant also stands convicted of second degree murder, as that offense is a lesser and included one of first degree murder under subsection (b). We would clearly remain within the appropriate limits of our judicial authority and within the confines of the statute under which appellant stands convicted, by basing our remand order upon appellant's underlying conviction for second degree murder, rather than upon a manufactured conviction of a crime not charged.

NOTE.—Reported at 364 N.E.2d 1007.