John DEARDORF, Defendant-Appellant,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 1–1184 A 291.

Court of Appeals of Indiana,
First District.

May 16, 1985.

James R. Cotner, Cotner, Mann & Chapman, Bloomington, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Kenneth P. Williams, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

NEAL, Judge.

### STATEMENT OF THE CASE

Defendant-appellant, John Deardorf (Deardorf), appeals from his conviction of theft by misrepresentation.

We reverse.

## STATEMENT OF THE FACTS

Deardorf is a meat trader doing business as Interstate Meats, who sells primarily to grocery chains and institutions. Indiana University (I.U.) in Bloomington had been a customer of Deardorf for several years when it sent out price requests on 200,000 pounds of U.S.D.A. graded good beef knuckles in January of 1983. The request stated phone bids would be accepted until noon on February 8. On February 4 the specifications were amended to also accept bids on house grade equivalent to U.S.D.A. graded good beef knuckles.

Approximately 60% of beef which is sold has been graded by the United States Department of Agriculture (USDA). House equivalent or house grade beef is that which the packer designates as being equal in grade to beef which the government has graded. A cut of beef which has been graded normally displays an ink stamp of the USDA shield and the grade.

On February 8 Deardorf called in three bids on beef knuckles, speaking to Len Elmore (Elmore), the secretary to William Dugger (Dugger) who is the senior buyer for Campus Food Services, a department of I.U. Elmore testified Deardorf bid $1.49 per pound on both USDA good knuckles and house grade equivalent, in addition to a bid of $1.39 on Australian beef. That day Elmore constructed a spread sheet, using the prices received from the various bidders. This spread sheet was employed to decide who should be awarded the bid in a meeting the afternoon of February 8. At this meeting were Dugger, Burwayne Jackson (Jackson), the director of Campus Food Services; Robert Shettleroe (Shettleroe), the plant manager of Campus Food Services; and Stanley Sherfield (Sherfield), the plant foreman of Campus Food Services. At that time it was decided the bid would go to a trader who had given a price of $1.42 per pound for house grade knuckles.

Later, Jackson suggested Elmore call Deardorf regarding his duplicate bids. Elmore testified when she telephoned Deardorf that evening he stated he had misunderstood and if I.U. wanted a bid on USDA good, could he change the price he had phoned in earlier. Elmore amended the spread sheet to show three prices bid by Deardorf; $1.55, $1.49 and $1.39. "Wexler only" was written at an angle near the highest price. Deardorf testified he did not bid a USDA graded product. He bid the product I.U. had been buying; Wexler at $1.55, Tennessee Dressed Beef house grade at $1.49 and the Australian beef knuckles at $1.39.

Wexler is a meat packer out of Chicago which Deardorf had used several times in filling orders for knuckles and other cuts of beef purchased by I.U. None of this beef had been USDA graded. Those at I.U. involved in the purchasing of meat stated they were familiar with Wexler's product and that Wexler did not ship USDA graded meat.

The following morning Jackson, who generally made the final decision as to what was purchased, told the others he had decided to go with Deardorf's bid of $1.55, which the three had not previously been aware of. It was understood the product would come from Wexler, however, Jackson represented that the order would be a "special deal" on USDA graded good knuckles. Dugger and Sherfield testified they knew, if the order was coming from Wexler, it wouldn't be USDA graded but would be house grade. Dugger, Sherfield and Shettleroe argued the $1.42 product would be sufficient and objected to paying what amounted to $26,000.00 more for Deardorf's bid. Jackson stated it was necessary for I.U. to go with the $1.55 bid because Campus Food Services needed the additional mark-up; that percentage of the price of its purchases the service receives in order to pay its overhead expenses.

Deardorf stated Dugger called him to say he got the bid for 200,000 pounds of knuckles at $1.55 per pound, although Dugger did not testify as to what quality of knuckles was specified. Dugger then sent to Deardorf a purchase order for USDA grade good beef knuckles, setting out a delivery schedule.

Deardorf returned I.U.'s copy of its price request with a handwritten notation "Wexler 1.55 lb." next to the specification for USDA GRADE GOOD knuckles. Dugger stated he knew this was inconsistent when he received it but he relied on Jackson's statement that it would be a special order. At the bottom of the returned sheet was another note "Wexler, USDA Good House Grade equal $1.49". Deardorf stated this was an error, and should have read Tennessee Dressed Beef. It should be noted that I.U. did not accept Deardorf's bid of $1.55 based on the written notation but on his phone specification.

Only Elmore testified that Deardorf represented the $1.55 bid to be for USDA graded, yet she also remembered him mentioning Wexler and wrote that on the spread sheet. She did not testify that Deardorf mentioned any "special deal". In Jackson's testimony there is no mention of a "special deal" from Deardorf or Wexler. He stated USDA graded good beef knuckles were purchased by I.U. and ordered from Deardorf, but he was not sure what I.U. received. None of Deardorf's written correspondence indicated the knuckles ordered by I.U. through him on February 9 were to be USDA graded good.

On February 10 Deardorf ordered 200,000 pounds of beef knuckles from Wexler, through one of its brokers. Wexler's sales manager stated the knuckles sent in response to the February 1983 order were the same as those shipped to I.U. in the past, particularly the two orders totaling approximately 30,000 pounds the previous month. I.U.'s purchase order regarding the knuckles ordered in January of 1983 also specified "US GOOD". In the past I.U. had always requested USDA graded beef yet accepted house grade. It was uncontested that "house equivalent" has no independent meaning but arises through previous transactions and depends on the customer's needs. Deardorf testified he ordered what I.U. had purchased before as USDA Good House Grade Equivalent.

The first load of Wexler knuckles in the February 9th order was shipped to I.U. on February 25. Deardorf's invoice, dated February 24 and stamped February 25, stated 36,600 pounds of beef knuckles at $1.55 per pound were being sent F.O.B. to Campus Food Services. George Berry (Berry), the shipping and receiving supervisor of Campus Food Services, signed the shipper's document for 36,600 pounds of Wexler meat, confirming the product was in good condition upon receipt. I.U. pays for its purchases "by shipment". An I.U. check request for $56,730.00 due to be remitted to Interstate Meats on March 3, was signed by Shettleroe and approved on February 28. An I.U. check in the requested amount payable to Interstate Meats and dated February 28 was stamped paid on March 3. This procedure was followed when the remaining shipments arrived throughout April and May.

Berry was aware that the purchase order for the knuckles specified USDA graded and that the boxes, when delivered, should, but do not always, bear the USDA shield and grade. When the first shipment arrived Berry immediately contacted Sherfield, as it was obvious from the shipping document the product had come from Wexler and the boxes were not stamped. Berry did not check to see if the meat itself was stamped. Sherfield at this time had the option of sending the meat back with the shipper because it did not conform to the purchase order specifications; however, he told Berry to accept it.

When a product is delivered which does not meet specifications, I.U. may either return it or keep it and seek a price adjustment. Typically, Berry would prepare a receiving memorandum addressed to Shettleroe and Sherfield and would notify Jackson and Dugger, who in turn would make a decision and initiate the adjustment process. Dugger insisted Jackson overruled all others in decisions as to what was accepted.

In this case, Sherfield notified neither Jackson nor Dugger of the discrepancy. Sherfield testified he took no steps to reject the knuckles because he "knew it wasn't going to be graded before it came" and

there was "no need to try to refuse them because Jackson, at that point, would know that they weren't USDA good knuckles." Sherfield reiterated Jackson knew he was purchasing ungraded good so when that was delivered, there was no reason not to accept it.

Shettleroe testified Sherfield told him of the contents of the shipment but he did nothing regarding the non-conforming goods because Jackson had already seen the shipment and had talked to Sherfield about the fact the knuckles were coming from Wexler. Dugger said he did not follow procedure because he thought Jackson would do nothing about the nonconformity. No one testified Deardorf represented to I.U. that he was sending USDA graded knuckles.

Following the delivery of the knuckles, Deardorf telephoned Sherfield to make sure they were satisfactory. He testified this was done as a "matter of practice" since he did not see the meat before it was shipped to a customer. Sherfield assured Deardorf the knuckles were fine and said nothing of the fact they were ungraded. Dugger said I.U. had no complaints regarding the quality of the Wexler knuckles delivered in response to the February 1983 order, and all of them were used as planned.

In early April 1983, Sherfield discussed this matter with his brother, a sergeant in the Indianapolis Police Department. Soon thereafter an investigator from the Marion County Prosecutor's office, Jack Sandlin, telephoned Sherfield concerning an alleged impropriety in meat purchasing. Following a meeting attended by Sherfield, Sandlin, a member of the State Board of Accounts and a state police officer, and nine weeks after the first shipment of knuckles had been accepted, Sherfield, Shettleroe and Dugger approached Robert Priest, the director of purchasing for Campus Food Service over Dugger, regarding the purchasing situation. An inspector for the USDA, Sandlin and various I.U. personnel examined the beef knuckles at issue and the USDA employee testified the meat was

what its packaging represented it to be; ungraded beef knuckles.

A grand jury indictment was filed on September 21, 1983, following several days of testimony. The indictment charged that Deardorf "knowingly exerted unauthorized control over property of Indiana University, to-wit: U.S. currency in the amount of $331,700.00 ... paid by I.U. for 214,000 pounds of ... beef knuckles, ... by creating ... the false impression that such beef knuckles had been graded good by the USDA" in violation of IND.CODE 35-43-4-2. The indictment included four additional counts dealing with similar transactions, one of which was dismissed before trial, two for which a verdict of not guilty was returned and one for which the verdict was set aside on double jeopardy grounds. Sandlin was the first grand jury witness called to testify. Thereafter, he remained in the hearing room, without the permission of the jurors, during the testimony of subsequent witnesses. Based on this fact Deardorf filed a motion to dismiss the indictment, which motion was denied. A six day jury trial was conducted in May of 1983, culminating in a verdict of guilty as to the charge set out above. A suspended sentence of one year and a $5,000.00 fine was imposed based on the verdict. Deardorf appeals from this jury verdict and judgment.

## ISSUES

Deardorf raises three issues; however, we find it necessary to discuss only two:

I. Whether the trial court erred in failing to grant Deardorf's motion to dismiss based on Sandlin's presence during the grand jury hearing.

II. Whether the evidence is sufficient to support the verdict.

## DISCUSSION AND DECISION

*Issue I.*

 Deardorf relies on *State v. Bowman*, (1981) Ind., 423 N.E.2d 605, for his argument that the unauthorized presence of a police investigator during grand jury

proceedings warrants dismissal of any charges filed. The decisive question in such situation is whether the officer's presence prejudiced the defendant's substantial rights, as prejudice is not *per se* presumed. *Fair v. State*, (1977) 266 Ind. 380, 364 N.E.2d 1007; *Sappenfield v. State*, (1984) Ind.App., 462 N.E.2d 241. Where the trial court finds the officer's presence intrusive; producing pressure on the other witnesses and the jurors, the indictment should be dismissed. *Brown v. State*, (1982) Ind. App., 434 N.E.2d 144.

Deardorf aligns the present facts with those in *Bowman, supra.* In both situations the officer present had been the case investigator who had interviewed most of the grand jury witnesses and was introduced at the hearing as such. The officer wore street clothes and sat several feet from the jurors, but did confer with the prosecutor and handle some of the state's exhibits during other witnesses' testimony. Both sets of jurors claimed the officer's presence had not influenced their decision. Facts distinguishing *Bowman* from this case are that in *Bowman,* the two investigators who remained were friends with many of the witnesses and answered questions of the jurors throughout the entire proceedings. Based on an evidentiary hearing in *Bowman,* the trial court found the defendant's right to a neutral and detached consideration by the grand jury had been violated by the two officers presence and participation in the proceedings. We cannot say the same is true in the present case.

■ Whether or not prejudice has occurred is a question of fact which the trial court must decide. This determination may be set aside only if it is clearly erroneous as unsupported by the facts and circumstances, and the reasonable inferences to be drawn therefrom. *Bowman, supra.* Viewed in this manner, we must uphold the ruling of the trial court which was made after a hearing and full review of the circumstances in this case. Sandlin was presented to the jurors as an investigating officer working in conjunction with the prosecutor's office. He did not ask ques-

tions of the other witnesses or answer those addressed to them. His behavior does not strike us as being injurious to the solemn, secretive nature of grand jury proceedings or to have interfered with the decision-making process of the jurors. "In the circumstances present here, we cannot say that the trial court, who alone had the opportunity to judge the credibility and demeanor of witnesses, reached a conclusion which is clearly erroneous." 423 N.E.2d at 609.

*Issue II.*

We first note this case is more accurately a matter of civil contract law. Deardorf asserts he made no misrepresentation as to the quality of the beef knuckles he bid and sold to I.U.; however, even if misrepresentation is found, it was in the nature of a future promise, not a past or present fact.

As discussed in *Coburn v. State*, (1984) Ind.App., 461 N.E.2d 1154, theft by creating a false impression is similar to the former offense of obtaining money or property under false pretenses and misrepresentation as to future acts or events will not support a conviction. Nor may the representation be promissory. Thus, "obtaining a loan solely under a promise to repay although there is an intention to not repay does not constitute an offense ..." 461 N.E.2d at 1156.

■ Another essential test is whether the representation deceived the party to whom it was made, such that the party relied on it in relinquishing control of his property. *Harwei, Inc. v. State*, (1984) Ind.App., 459 N.E.2d 52. If the intended victim is aware of the falsity of the representation the offense of theft by deception is not accomplished because no erroneous impression is created.

■ We find in the present case, viewing the evidence most favorable to the state, that when Deardorf gave a phone bid on USDA graded good beef knuckles at $1.55 per pound, he, in effect, said he would sell USDA knuckles to I.U. at a price of $1.55. Such is not a statement of past or present fact. In the area of contract law, Deardorf's bid in response to I.U.'s price re-

quest is a mere offer and not binding as an "agreement to make an agreement" because all of the conditions were not specified at that time. *See Goethals v. DeVos,* (1977) 174 Ind.App. 143, 366 N.E.2d 673; *Helvey v. O'Neill,* (1972) 153 Ind.App. 635, 288 N.E.2d 553. If the meat purchasers at I.U. did rely on Deardorf's oral bid, such was only for the purpose of deciding to go with this offer; to make a contract. I.U. did not part with money based on Deardorf's representation that he would sell USDA graded knuckles.

The state relies on *Royal Business Machines, Inc. v. Lorraine Corp.,* (7th Cir. 1980) 633 F.2d 34, as support for its premise that Deardorf's bid constituted a misrepresentation of present fact. However, *Royal* deals with punitive damages in a civil breach of warranties case applying the pre-*Travelers Indemnity* standard of proof in Indiana. *See Travelers Indemnity Co. v. Armstrong,* (1982) Ind., 442 N.E.2d 349. As such, we do not find it compelling in the case at bar. *See Fowler v. Hilliard,* (S.D. Ind.1984) 585 F.Supp. 1320; *Canada Dry Corporation v. Nehi Beverage Company,* (7th Cir.1983) 723 F.2d 512. We do note one statement by the court in *Royal* which lends credence to our finding that Deardorf's oral bid cannot be upheld as the basis of his conviction, which is that "an affirmation of fact which the buyer from his experience knows to be untrue cannot form a part of the basis of the bargain." 633 F.2d at 44. All those involved in purchasing meat for I.U., except Jackson, testified they knew the knuckles were to come from Wexler, that Wexler did not deal in graded beef and that the delivery of ungraded knuckles from Wexler was no surprise. Thus, it appears any representation by Deardorf that USDA graded good knuckles were being offered at $1.55 was not only a statement as to future performance but also not relied on as it was known by I.U. to be false. There is no evidence as to representations made by Deardorf at the time the bargain was struck; when Dugger called Deardorf to accept his bid and arrange for shipping the knuckles. However, this is not the decisive transaction in our decision to reverse Deardorf's fine and conviction.

The evidence shows that I.U. pays for its meat by the shipment, not when a bid is accepted. The documentation here shows the first load of Wexler knuckles was delivered, recognized to be ungraded, accepted, and thereafter, paid for by I.U. I.U. did not part with control of $371,700.00 based on any representation by Deardorf that he was selling USDA graded good knuckles at $1.55 per pound. I.U. paid for each shipment of knuckles after they were delivered, relying on the knuckles as received. The state presents no evidence, and does not assert that I.U. believed the knuckles to be USDA graded good when they were accepted. I.U. knew any representation as to USDA graded knuckles was false when Deardorf exerted control over I.U.'s check made payable to his meat company. Therefore, Deardorf cannot have committed theft by knowingly exerting unauthorized control over the property of I.U. by creating a false impression.

For the above stated reasons, this cause is reversed.

Judgment reversed.

RATLIFF, P.J., and ROBERTSON, J., concur.