**Donald H. DUNNUCK, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 18A02–9310–CR–559.**

Court of Appeals of Indiana,
First District.

Dec. 28, 1994.

Transfer Denied March 3, 1995.

4. *See* IND.CODE §§ 31–1–11.6–1 to 31–1–11.6– 25.

Jack Quirk, Muncie, for appellant.

Pamela Carter, Atty. Gen., Suzanne Weber Lupton, Deputy Atty. Gen., Indianapolis, for appellee.

## OPINION

BAKER, Judge.

Here, we examine the intricacies of proving that counsel to a governmental entity

aided a bidder in committing theft to obtain a contract on a public project. Appellant-defendant Donald H. Dunnuck assails his convictions for Aiding in Theft[1] and Perjury[2], as Class A misdemeanors. He charges that his actions and statements did not constitute aiding in theft or perjury. Additionally, he argues that prosecutorial misconduct occurred, and he challenges the sufficiency of the indictments, the propriety of the judge's response to the jury's requests during deliberation, and the order of restitution.

## FACTS

Dunnuck's convictions are based upon his involvement with the construction of the Delaware County Justice Center. The proceedings against Dunnuck pertaining to the Center are but one of the many controversies surrounding the Center's history. Numerous problems, delays and financial overruns plagued the project creating intense media scrutiny and public chiding. The Center was a joint project between Delaware County and the City of Muncie, memorialized in an Interlocal Agreement providing for the Center's management. The agreement established a Board of Supervisors to manage, operate and maintain the building. The mayor of Muncie appointed Dunnuck to this Board, and he was elected as its Chairman. Dunnuck simultaneously served as the county attorney for the Delaware County Commissioners from May 9, 1988, to January 1, 1989, and again after November 6, 1989.

During the construction of the Center, a dispute arose whether the Board had the authority to solicit bids for the telephone system installation. However, the Commissioners acquiesced to the Board's execution of the bidding process.

In Spring 1989, Janice Wagner, a sales representative for T.S.I. Communications Systems (TSI) contacted Dunnuck and offered to perform a needs study to determine the Center's specifications for a telephone system. Upon assessing the Center's needs, TSI drafted the bidding specifications. In August 1989, two advertisements in the local newspaper sought bids for the project. Dun-

nuck held a pre-bid meeting at his law office on August 25, 1989. Several potential bidders attended the meeting and received the specifications prepared by TSI. Two changes to the written specifications were made at the meeting but not reduced to writing. First, the installation cost for the labor for the wiring was omitted and a change was made concerning the date of the equipment. Six bids, including TSI's late bid, were submitted to Dunnuck who gave them to the county auditor. The Board of Supervisors voted to accept all the bids including any late ones since the timely bids were still sealed. The Commissioners opened the bids at a public meeting on September 15, 1989. TSI's bid was the fourth lowest.

At the demonstration meeting a week later, TSI's owner Daniel Sayre and Wagner highlighted the negative aspects of TSI's competitors' bids. Following the demonstration, TSI designed a form to analyze all of the bids in anticipation of a 20% expansion of the telephone system. Wagner then met with Dunnuck and advised him about their analysis for a 20% expansion. Under TSI's computation, TSI became the second lowest bidder. Two other bidders submitted their calculations for a 20% expansion using their services.

Dunnuck first presented the analysis of each bid using TSI's method estimating a 20% expansion cost to the Board of Supervisors for their approval. The Board then sent the bids and the analysis to the Commissioners via Dunnuck's October 18, 1989, letter as Chairman of the Board. County Attorney Jerry Thornburg formally resubmitted the bids with the Board's analysis to the Commissioners at their November 27, 1989, meeting. Record at 786. On January 8, 1990, the Commissioners awarded the contract to TSI stating their reasons for finding TSI to be the lowest responsible and responsive bidder. The contract for $54,590 was executed January 22, 1990.

None of the other bidders attempted to enjoin TSI's performance of the contract by arguing that TSI was not the lowest respon-

1. IND.CODE § 35-43-4-2.

2. IND.CODE § 35-44-2-1.

sible and responsive bidder. However, a grand jury conducted an investigation of the Center. When Dunnuck was asked whether other vendors besides TSI had been requested to develop a needs study for the Center's specifications, he replied that salespersons from all vendors that contacted him had been asked to assist. However, the vendors denied any such requests were made. Dunnuck also stated that he met with the different vendors routinely before and after the pre-bid meeting. Based upon Dunnuck's statements, he was charged with perjury. He was also charged with aiding in theft. The information specifically alleged that in 1988 and 1989 Dunnuck aided Sayre in exerting unauthorized control over Delaware County money with the intent to deprive the county of the use and value of the money. Following a jury trial, Dunnuck was convicted of both charges. The court entered judgment on both convictions as Class A misdemeanors and ordered suspended sentences, placing Dunnuck on probation.

### DISCUSSION AND DECISION [3]

#### I. Aiding in Theft

■ Dunnuck maintains that the evidence most favorable to the verdict does not establish that he aided Sayre to commit theft. Reviewing an insufficiency claim, we neither weigh the evidence nor judge the credibility of witnesses. *Jones v. State* (1992), Ind., 589 N.E.2d 241, 242. We consider only the evidence of probative value and the reasonable inferences therefrom that support the verdict. *Id.* The verdict will be upheld if there is substantial evidence of probative value supporting the conviction.

■ To prove aiding in theft as alleged in the indictment, the State was required to demonstrate that Dunnuck knowingly or intentionally assisted Sayre to obtain unauthorized control over Delaware County money with the intent to deprive Delaware County of the use and value of that money. *See* I.C. § 35–43–4–2. Unauthorized control of property may be achieved by creating or confirm-

ing a false impression in another person, or by failing to correct a false impression that the person knows is influencing the other if the person stands in a relationship of special trust to the other. I.C. § 35–43–4–1(b)(4) & (5). Where the theft is committed by the creation of a false impression, the representations creating that false impression must be of past or existing fact and the party relinquishing control of the property must have relied on the misrepresentation. *Deardorf v. State* (1985), Ind.App., 477 N.E.2d 934, 938.

■ The State argues that it met its burden by showing Dunnuck knowingly and intentionally assisted Sayre in circumventing the competitive bidding process and misleading the Commissioners into awarding TSI the telephone contract. The State further contends that Dunnuck actively cultivated false impressions in the Commissioners and failed to correct them despite his position as county attorney and Chairman of the Board of Supervisors.

In support the State cites the following evidence. First, Dunnuck allowed TSI to draft the specifications for the project but failed to advise the Commissioners of this fact. However, Dunnuck did inform the Commissioners that TSI performed the needs study for the Center, from which the specifications are developed. R. at 1085. Additionally, the Commissioners' own representative was one of the members of the Board of Supervisors with whom it was openly discussed that TSI was drafting the specifications. R. 2788, 2799–2801. Moreover, this omission is not one which the State has shown that the Commissioners relied upon in awarding the telephone contract. None of the Commissioners stated that they would not have awarded TSI the contract had they known TSI drafted the bid specifications. At most, one commissioner said he might have asked the Board of Supervisors a question. R. at 2227. The evidence does not show that Dunnuck's silence on this fact created a false

---

**3.** We direct Dunnuck's counsel to Ind. Appellate Rule 7.2(A)(3), which requires notations be made on the margin of each page of the transcript of the evidence indicating, among other things, the name of each witness. It would have been particularly helpful in our review had counsel followed this rule and named the testifying witness in the margin throughout the 12 volume record.

impression that the Commissioners relied upon in awarding the contract.

■ The State also complains that the specifications failed to comply with the statutory bidding laws because they directed delivery of the bids to Dunnuck's office rather than to the auditor and did not require that a bid be returned on a Form 95 with a non-collusion affidavit or that a bid bond be supplied. Although the proper procedure is for bids to be directly delivered to the auditor, the auditor testified that he obtained the sealed bids from Dunnuck and delivered them to the Commissioners to be opened at the public meeting on September 15, 1989. R. at 2082, 2054–55. The improper delivery did not taint the bids which remained sealed. Also, a bid bond was not necessary since the bids were below $100,000. IND.CODE § 36–1–9–6(b). Lastly, Dunnuck informed the Commissioners of the bids noncompliance with the bidding laws noting that they were not submitted on a Form 95 with a non-collusion affidavit. R. at 1165. Again, the Commissioners were not misled.

■ The State further charged that the bidding laws were violated because the bids were not spread of record at a public meeting as required and the Commissioners accepted late bids. However, Dunnuck was not serving as the county attorney during the period of the public meeting, and thus, cannot be charged with the responsibility for ensuring that the Commissioners adhered to the bidding laws.

■ On October 18, 1989, Dunnuck submitted the Board of Supervisors' analysis of the bids to the Commissioners using the 20% expansion evaluation prepared by TSI. Dunnuck's letter stated factors that the Board of Supervisors recommended the Commissioners consider in awarding the contract, such as service and location of the vendor. R. 1165. However, the State alleges that these two factors in the Board's analysis were not mentioned in the specifications as were required by law. IND. CODE § 36–1–9–3(b) provides that the specifications *may* include that the bids will be evaluated on the basis of

such factors as reliability, productivity, and the costs of maintenance or service. Contrary to the State's belief, the statute does not mandate giving notice of the weight of any evaluating factors in the bid specifications.[4]

■ The State next argues that the Commissioners relied on Dunnuck's analysis and recommendation, which they did not know were compiled with TSI's assistance, when they awarded TSI the contract. On January 8, 1990, Dunnuck, acting as county attorney, presented the final contract to the Commissioners for TSI's services. The State maintains that Dunnuck did not relate to the Commissioners that the contract terms differed from the original specifications. More particularly, the contract excluded the cost of the installation of the wiring, a change in the specifications made at the pre-bid meeting that was not reduced to writing. The installation was later added as a change order awarding TSI $19,000 additional compensation. Also, the vendors bid on a single system for two buildings as the specifications required, but TSI installed several separate systems. The State concludes that these differences from the original specifications demonstrate that Dunnuck misrepresented the type of system that the Center would receive and that TSI was the lowest bidder for the telephone contract.

We first observe that TSI was only the second lowest bidder even after the 20% expansion analysis. Thus, TSI was not misrepresented as the lowest bidder as the State contends. Next, Dunnuck did not represent that TSI would install a single system. The analysis clearly reflects that TSI's bid quoted three systems tied together. R. at 1085. Although the specifications impliedly requested a single system, TSI was not the only bidder to offer a multiple system. *See* R. at 1070, 1117. The Commissioners testified that they relied upon Dunnuck's analysis and recommendations. R. 2265, 2229–30. The analysis clearly informs the Commissioners of the type of system each bidder would install. The Commissioners were not thereby misled. Under its theory of aiding in

---

4. I.C. § 36–1–9–3(c) discusses such criteria for proposals to develop specifications when I.C. § 36–1–9–3(b) is not used. It appears that I.C. § 36–1–9–3 was applicable here.

theft, the State failed to establish the necessary elements that Dunnuck created false impressions to the Commissioners and failed to correct them and that the Commissioners relied on those impressions to award TSI the contract. Considering the evidence most favorable to the verdict, we find it is insufficient to establish aiding in theft.

## II. Perjury

Dunnuck next asserts that the State failed to prove perjury. We review a sufficiency challenge without reweighing the evidence or resolving questions of credibility. Rather, we will look only to the evidence most favorable to the verdict. *Jones v. State* (1992), Ind., 589 N.E.2d 241, 242.

Perjury is the making of a false, material statement under oath or affirmation knowing the statement to be false or not believing it to be true. IND.CODE § 35-44-2-1. The perjury indictment alleged the following statements Dunnuck made at the grand jury hearing constituted perjury:

[Dunnuck]: ... I said, we need a needs study. I would have salesmen contact me from each of these people and I said do a needs study. So the only one that ever did a needs study that I know of was TSI.
Q: Okay. In fact they say the opposite. They say, we never had an opportunity to ever talk to any of the users.
D: Well, that would be false, in my opinion. And let me tell you, after we did this, there was a needs study done and everybody got together and said what we want to do is make sure we've got a level playing field. And so TSI or—I don't know if it was TSI or who, I think it was TSI, came up with a set of specifications. TSI says, I've checked all of the offices and we need a hundred and two (102) telephones.
Q: Uh-huh.
D: This is what they want, this is what it should be. All of the users—all of the bidders, vendors, went through that and I said, what we're going to do is come up with a set of specifications. If any—and TSI is going to prepare them, as I recall. If you've got a problem with that, let's hear it right now. If you want to change any of these, let's hear it. And so we had

a meeting. I think we had a meeting in my office in the library. I'm not sure of that, but I think so. We went over this and everybody said this was fine. And then that's what we did.
Q: Is it—I want to back you up on that just a minute. Did everybody say this is fine or did just nobody stand up and say there is nothing wrong?
D: There was no objections to.
Q: Did you really expect any objections?
D: Sure. Sure. I met with these people individually. Everyone of them individually.
Q: You did?
D: I did.
Q: Before or after that meeting?
D: Both.
Q: Individually before and individually after?
D: Oh, I met with them routinely.

R. at 15–16. Dunnuck argues that the State failed to show that these statements were false or material.

■ We review Dunnuck's first two statements regarding the needs study. He testified that the vendors had the opportunity to perform a needs study. He stated that vendors that contacted him were specifically asked to do a needs study. Contrary to the State's assertion, Dunnuck did not declare that he invited every vendor to conduct a needs study. Dunnuck remembered only talking to two vendors about a needs study, which he believed were TSI and Taylored. The State's evidence showed that Dunnuck spoke to TSI and CPI, not Taylored. R. 2741–48. Also, both CPI and TSI performed needs studies, although Dunnuck thought only TSI prepared one. The evidence most favorable to the State shows that Dunnuck was confused about the companies with whom he had discussed a needs study and the number of studies done. Confusion and inconsistencies are insufficient to prove perjury. *Fadell v. State* (1983), Ind.App., 450 N.E.2d 109, 114.

■ Dunnuck further averred that the vendors had an opportunity to talk to the

users. The record shows that Dunnuck did not discourage contact with the users until the pre-bid meeting after two needs studies had been prepared. Thus, his averment is not false, since they did have such opportunity before the pre-bid meeting. The State fails to show that Dunnuck's first two statements regarding the needs study were false.

Dunnuck's next statements alleged to be perjurious concerned whether any of the vendors objected to the bid specifications. The State posits that Dunnuck's comments suggest that the vendors met prior to the pre-bid meeting and jointly acquiesced to TSI's preparation of the specifications. The State's slant cannot be accepted without distorting Dunnuck's phrases out of their context. Dunnuck is clearly referring to the pre-bid meeting at which time the specifications that TSI had drafted were discussed among the vendors. The State fails to point to any evidence that the vendors voiced any objections to the bid specifications other than the two changes that were agreed upon at the meeting. Again, the State failed to meet its burden of proving that Dunnuck's statements were false.

The State contends that Dunnuck's final statements about meeting with the vendors creates a false impression that he had frequent contact with each vendor throughout the entire process. Although the State attempted to elicit whether Dunnuck met with each vendor individually before *and* after the meeting, Dunnuck responded only that he met with them routinely. The record supports Dunnuck's statements as being true. R. at 1196, 1232, 1401–04, 1408, 1520, 1539, 2434, and 2741–48. Because one element of perjury is lacking, we need not examine whether the statements were material. We reverse Dunnuck's perjury conviction. Because we reverse both convictions for insufficient evidence, we do not address the other issues raised.

In conclusion we would note that although we reverse Dunnuck's convictions, we do not condone his actions. The evidence reflects that Dunnuck acted questionably in his role as the Chairman of the Board of Supervisors for the Justice Center. However, Dunnuck's conduct did not amount to the crimes of theft and perjury.

Reversed.

SULLIVAN and FRIEDLANDER, JJ., concur.